[No. H001333. Sixth Dist. Feb. 2, 1987.]

THE PEOPLE, Plaintiff and Appellant, v.
ERIC LUIS MEZA, Defendant and Respondent.

Counsel

John K. Van de Kamp, Attorney General, Eugene W. Kaster and David Rose, Deputy Attorneys General, for Plaintiff and Appellant.

Leelane E. Hines, under appointment by the Court of Appeal, for Defendant and Respondent.

Opinion

BRAUER, J.—An information accused respondent Eric Luis Meza of the crime of perjury, a felony. (Pen. Code, § 118.) The court below set the information aside. (Pen. Code, § 995.) The People appeal. (Pen. Code, § 1238, subd. (a)(1).) We reverse.

The principal question before us is whether a prospective juror, who has taken an oath that he will "well and truly" answer questions put to him concerning his qualifications as a juror, can commit perjury by concealing his kinship with the defendant. We hold that he can.

I.

On October 24, 1984 jury selection began in action No. CR 10625 in Monterey County Superior Court. In that action one Arthur Nestor Ramirez was accused of the crime of burglary, i.e., entry of a residence with the intent to commit an assault with a deadly weapon therein. (Pen. Code, § 459.) Respondent Meza, whose sister was married to the defendant Ramirez, was one of the prospective jurors.

Before voir dire commenced the court clerk administered an oath to all of the prospective jurors. By the terms of the oath the jurors promised to answer "well and truly" questions concerning their qualifications to act as trial jurors.[1] The court explained that "voir dire is designed to find out if you know anything about the case or if you have any biases that maybe in

---

[1]The precise text of the oath was this: "You, and each of you, do solemnly swear that you will well and truly answer such questions as may be asked of you touching upon your qualifications to act as trial jurors in the cause now pending before this court, so help you God."

this particular case it wouldn't be the fairest thing for you to set [*sic*] on . . . ." The names of twelve persons were drawn, and those persons were directed to take seats in the jury box. One of the twelve was respondent Meza.

The court explained basic rules on the credibility of witnesses, direct and circumstantial evidence, objections, burden of proof, and hearsay. Then the court introduced the defendant Ramirez and his attorney, Mr. Sanchez, and asked this question: "Does anybody know Mr. Ramirez or his attorney, Mr. Sanchez?" Two jurors responded; one of them spoke verbally, the other raised his hand. Meza did neither. After a brief colloquy with each of the two jurors in turn the court asked, "Anybody else? I see no hands."

The court then asked whether any of the prospective jurors (1) knew the prosecuting attorney or any member of his staff; (2) could not follow the law pursuant to the court's instructions; (3) had friends or relatives engaged in law enforcement; (4) had been the victims of any crime within the past ten years; and (5) had previously served on a jury. In posing those questions the court specifically directed jurors having affirmative answers to raise their hands. In such fashion three persons responded to the third question, one to the fourth question, and several to the fifth question. In the course of questioning the court made these comments: "[O]bviously we ask a few questions and we try to not overly consume time, but can anybody think of any reason at all why they couldn't be a fair and impartial juror? [¶] That's what we're trying to get, people that aren't leaning toward the People's side or the defendant's side, but fair and impartial to both sides. [¶] Anybody feel for any reason that they couldn't be? [¶] All right."

After exploring the occupations and marital and family status of the seated jurors, the court then allowed counsel to question them. The prosecuting attorney proceeded first. He asked the following questions of Meza, and Meza gave the following answers:

"Q. And do you feel that you could render either decision in this case, guilty or not guilty depending on what you thought of the evidence and what it meant to you?

"A. Yes, I do.

"Q. And that if you listen to the evidence and in your view it proves the charges, do you feel that you would be able to convict?

"A. Yes.

"Q. And the other way around if it wasn't sufficient, your job would be to acquit?

"A. Right.

"Q. Any opinions about the courts, lawyers, judges or the police that you think might have a bearing on the way you look at the evidence in the case?

"A. No.

"Q. Any opinions about guns that you're aware of that you think might have an effect on your judgment?

"A. No.

"Q. Can you think of anything that you think might cause you to be less than fair in a case like this?

"A. No."

In his turn defense counsel questioned Meza, and Meza responded as follows:

"Q. And do you understand that it's up to the District Attorney, to this gentleman here, to prove the case against the defendant?

"A. Right.

"Q. And can you guarantee me that you're not going to come to a decision in the case until you have heard all the evidence?

"A. Uh-huh.

"Q. And after all the evidence is in, then you will make up your mind?

"A. Yes."

Ultimately Meza was selected and sworn as a trial juror.

The following morning, in the courtroom out of the presence of the jury, the court informed counsel that it had received information to the effect that the defendant Ramirez was somehow related to Juror Meza.[2] A curious colloquy ensued:

---

[2] The record does not reveal how the court received this information, or from whom.

"THE COURT: Mr. Ramirez, I just wanted to make sure you're aware and advised of the fact that you have a right to—no one can compel you—but you have a right to testify on your own behalf in this matter. Do you recognize that fact and you choose not to testify, is that right?

"DEFENDANT RAMIREZ: Yes.

"THE COURT: Okay. And you concur in that, counsel?

"MR. SANCHEZ [Defense counsel]: Yes.

"THE COURT: We have to take up the jury instructions, and we're taking up the matter of those, but Mr. Ramirez, your wife is not related to any people on the jury; is that right?

"DEFENDANT RAMIREZ: Nobody on the jury."

"THE COURT: Anybody on the jury related to your wife at all?

"DEFENDANT RAMIREZ: He's related to the wife of one of them.

"THE COURT: Pardon?

"DEFENDANT RAMIREZ: The wife—you mean Mr. Meza's wife?

"THE COURT: Yes.

"DEFENDANT RAMIREZ: She's related to her.

"THE COURT: How?

"DEFENDANT RAMIREZ: I don't know. I don't really associate with him or the girl or the people.

"THE COURT: But his wife is your wife's sister?

"DEFENDANT RAMIREZ: Cousin or sister, yeah, something like that, I think, sister."

At that point the judge summoned Meza to the courtroom. Meza denied that his wife was related to Ramirez' wife, and then came the denouement:

"THE COURT: And you have never met Mr. Ramirez before?

"MR. MEZA: No.

"THE COURT: And you don't know his wife at all?

"MR. MEZA: Well is he, I—you know, he—I, you know, I know him because he is supposedly my brother-in-law, but you know, I've never considered him my brother-in-law because of the things he's done to my sister, and I was taking a personal interest in this because I thought it was something I could do to, you know help out the other side, um, because he has done things, you know, to my family, and, you know, I was taking it kind of personal.

"Do you understand what I'm saying? And so, therefore—

"THE COURT: I think I understand what you're saying, and I think you're going to have to understand when [sic] I'm saying. You're under oath; that's why we swore you in. You're under oath.

"MR. MEZA: I vaguely remember you asking that.

"THE COURT: Well, what do you think the purpose of the jury voir dire is? We're trying to find people that don't have an interest—so you do know Mr. Ramirez?

"MR. MEZA: Vaguely.

"THE COURT: Wait a minute. Don't hedge. You know him; is that right?

"MR. MEZA: Yes.

"THE COURT: And your wife—your wife is his wife's sister; is that correct?

"MR. MEZA: No, that is not correct.

"THE COURT: Okay. What's the relationship?

"MR. MEZA: She's my sister.

"THE COURT: Who is?

"MR. MEZA: His—

"THE COURT: His wife is your sister?

"Mr. Meza: Yeah.

"The Court: And you saw her—

"Mr. Meza: You see, what I was—

"The Court: And you saw her setting [*sic*] here in the courtroom?

"Mr. Meza: Yeah, because I wanted for him to have to go back to prison because there's been a lot of hardship put on our lives.

"The Court: I can appreciate you personally feeling that way. What I'm saying is it's not fair to him. It's not fair to the people, and it's not fair to the system for one who has knowledge and one who has information about this case other than what comes through the courtroom to set [*sic*] on a jury, and that's why we asked you the questions: 'Do you know the defendant or any of the parties? Do you know anything about the case? Is there any reason you can't be a fair and impartial juror?'

"Mr. Meza: Because there was a time when she was pregnant, and he pushed her down and we got into a big heated argument and father was there—

"The Court: Who got into a big, heated argument?

"Mr. Meza: Art and I did.

"The Court: That's the defendant?

"Mr. Meza: Yes, you know, because he had pushed my sister when she was pregnant.

"The Court: So you know him; is that right?

"Mr. Meza: Just through that incident.

"The Court: Okay. Well, have you talked to any of the other jurors about this matter or about the case whatsoever?

"Mr. Meza: No, I haven't.

"The Court: Okay. I see. You lied under oath; so you have some problems, sir, and no matter what your motivation was, you have got some prob-

lems, and I'm going to direct the District Attorney's Office to look into the matter to see whether you committed perjury, in violation of the law, and I can appreciate maybe why you did it; although it's wrong.

"And Mr. Ramirez, obviously, you knew he was related to someone and if you didn't bring that to the attention of your attorney—you were setting [*sic*] right there, you knew he was related to you in some way?

"DEFENDANT RAMIREZ: No.

"THE COURT: Did you have a fight with him like he said?

"DEFENDANT RAMIREZ: Yeah, I did. Then I don't—I don't see them people. I don't even see their family. I never see him or his family or nothing, have nothing to do with me, and the motive that he has is."

Meza was excused from further jury service, and his place was taken by an alternate juror.

## II.

Approximately nine months later a criminal complaint accusing Meza of perjury was filed in Monterey County Municipal Court.[3] At the preliminary hearing the prosecution introduced in evidence (1) a partial transcript of the proceedings in the Ramirez case, including the portions we have quoted *supra*; (2) birth certificates of Meza and his sister; and (3) a marriage certificate showing that Meza's sister was the wife of Ramirez. Defense counsel moved to exclude those portions of the partial transcript which recited incriminating statements made by Meza; counsel's position was that those statements were hearsay and had been obtained in violation of Meza's *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 478-479 [16 L.Ed.2d 694, 725-727, 86 S.Ct. 1602]). The magistrate denied the motion, and held Meza to answer.

Subsequently an information was filed in action No. CR 11385 in Monterey Superior Court, which is the action now before us. The information alleged that Meza had violated Penal Code section 118, that he had taken an oath in the Ramirez case, and that he "did willfully and contrary to such oath state as true a material matter which he knew to be false, to wit: that he did not know Arthur Ramirez and that he would be fair and impartial." Meza's counsel moved to set aside the information pursuant to

---

[3]The complaint itself is not in the record before us. Meza was excused as a juror on October 25, 1984. The preliminary hearing was held on August 16, 1985.

Penal Code section 995. He argued (1) that Meza's lack of response during the Ramirez jury voir dire did not constitute perjury under Penal Code section 118, and (2) that Meza's statements to the trial judge had been elicited in violation of Meza's *Miranda* rights. The superior court took the matter under submission, and thereafter issued the following order:

"Defendant's Motion under PC 995 is *Granted.* The primary focus of the allegations of perjury is Defendant's *failure to respond to questions* asked as to whether he knew the Defendant [Ramirez]. The only positive response to questions is that he could be 'Fair'. Under present legal authority a failure to respond to a question cannot support a perjury count. See *People v. French 134 Cal. App. 694 (1933)*; Witkin, *California Crimes,* V2, P. 789. His positive response that he could be 'Fair' is so inherently ambiguous due to its 'Subjective' quality, that it cannot support a perjury charge. Although the transcript raises serious questions as to the Defendant's conduct it appears that it would not support a perjury count.

"Bail is exonerated." (Italics in original.)

From that order the People appeal. They here contend (1) that silence, when intended as a substitute for oral expression, may constitute perjury; (2) that Meza's verbal answer of "No," given in response to the question of whether he could think of anything which would make him "less than fair," may constitute perjury; and (3) in any event, a jury should have been allowed to decide whether Meza committed perjury as a matter of fact.

For his part Meza argues (1) that silence cannot amount to perjury; (2) that his suggestion that he could be "fair" was ambiguous at best, and therefore did not constitute perjury; (3) that his statements given to the trial judge out of the presence of other jurors were elicited in violation of his *Miranda* rights, and therefore should not have been considered by the magistrate in holding Meza to answer.

Before considering these arguments we pause to review certain principles relating to voir dire examination of jurors.

### III.

"At common law, *voir dire* of a prospective juror was permitted only after interposition of a challenge for cause. (Miller, Civil Procedure of the Trial Court in Historical Perspective (1952) pp. 289-291.) In Britain and Canada, where such a restriction is still the rule, it is very unusual for an attorney to *voir dire* a juror. (*Id.,* at p. 289.)" (*People* v. *Crowe* (1973) 8 Cal.3d 815, 821 fn. 1 [106 Cal.Rptr. 369, 506 P.2d 193].) When the California Penal

Code was enacted in 1872 it contained no provision for voir dire examination of prospective jurors by counsel. (See, e.g., Pen. Code §§ 1061-1063, 1066-1068, 1071-1074, 1076; see also *People* v. *Edwards* (1912) 163 Cal. 752, 754 [127 P. 58], overruled on another point in *People* v. *Williams* (1981) 29 Cal.3d 392, 407 [174 Cal.Rptr. 317, 628 P.2d 869].) Under the Code counsel was required to interpose a challenge for cause first (Pen. Code, §§ 1066-1068); and if the challenge was denied, it was tried before the court (Stats. 1873-74, ch. 614, § 59, p. 443). Penal Code section 1081 read then (as it does now) that "[u]pon the trial of a challenge to an individual juror, the juror challenged may be examined as a witness to prove or disprove the challenge, and must answer every question pertinent to the inquiry." Under section 1082 other witnesses could be examined on the trial of the challenge. Section 1083 provided (and still provides) that "[t]he court must allow or disallow the challenge, and its decision must be entered in the minutes of the court."

Nevertheless the right of counsel to conduct such voir dire examination prior to challenge was established by court decision in 1855. (*People* v. *Backus* (1855) 5 Cal. 275, 277-278.) In 1860 the California Supreme Court wrote this: "It is the common practice in this State to interrogate a juror, when he is first called upon his *voir dire,* generally as to his qualifications, with a view to obtain information upon which to rest a specific challenge. This practice, though productive of some inconvenience, is one of necessity; for, unless it be followed, it will often be quite impossible to ascertain the qualifications of the juror." (*People* v. *Reynolds* (1860) 16 Cal. 128, 131; see also *People* v. *Edwards, supra,* 163 Cal. at p. 754.)

In 1927 an amendment to Penal Code section 1078 imposed upon the trial court the *duty* "to examine the prospective jurors [and] to select a fair and impartial jury." (Stats. 1927, ch. 605, § 1, p. 1039; *People* v. *Crowe, supra,* 8 Cal.3d at pp. 822, 828.) The following year the California Supreme Court reluctantly approved of "a collective examination by the trial court of jurors drawn and seated in the jury-box . . . ." (*People* v. *Estorga* (1928) 206 Cal. 81, 85 [273 P. 575].) Collective voir dire examinations have been utilized by trial courts ever since. (*People* v. *Crowe, supra,* 8 Cal.3d at pp. 819-820, 828-829; *People* v. *Soltero* (1978) 81 Cal.App.3d 423, 428-429 [146 Cal.Rptr. 457], cert. den. 439 U.S. 933 [58 L.Ed.2d 328, 99 S.Ct. 325]; *People* v. *Dorsey* (1974) 43 Cal.App.3d 953, 964-966 [118 Cal.Rptr. 362]; *People* v. *Casserio* (1936) 16 Cal.App.2d 223, 227 [60 P.2d 505].) In putting questions collectively to prospective jurors trial courts have taken "silence to be the negative or affirmative answer called for" (*People* v. *Dorsey, supra,* 43 Cal.App.3d at p. 965), or have asked the jurors to raise their hands (*People* v. *Casserio, supra,* 16 Cal.App.2d at p. 227).

Taking silence to mean "No," and asking jurors to raise their hands, both practices inherent in collective questioning, have found approval in the Standards of Judicial Administration adopted by the Judicial Council. Section 8.5 of those Standards sets forth questions that should be asked by the trial court in examining prospective jurors in criminal cases. One of the questions there listed is this:

"Mr. (defendant), please stand and face the prospective jurors in the jury box and in the audience seats. (Defendant complies.) Is there any member of the jury panel who is acquainted with the defendant or who may have heard his name prior to today? If your answer is yes, please raise your hand." (Cal. Standards Jud. Admin., § 8.5, subd. (c)(4)(a).)

Another such question is this:

"Do any of you have any belief or feeling toward any of the parties, attorneys or witnesses that would make it impossible, or difficult, for you to act fairly and impartially, both as to the defendant and the People? Do any of you have any interest in the outcome of this case?" (Cal. Standards Jud. Admin., § 8.5, subd. (c)(9).)

Still another question is this:

"Do you know of any other reason, or has anything occurred during this question period, that might make you doubtful you would be a completely fair and impartial juror in this case or why you should not be on this jury? If there is, it is your duty to disclose the reason at this time." (Cal. Standards Jud. Admin., § 8.5, subd. (c)(21).)

■ The purpose of these inquiries is, of course, "to ascertain whether prospective jurors are, through the absence of bias or prejudice, capable of participating in their assigned function in such fashion as will provide the defendant the fair trial to which he is constitutionally entitled." (*People* v. *Fimbres* (1980) 104 Cal.App.3d 780, 788 [163 Cal.Rptr. 876].) " 'The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to trial by jury guaranteed by the Constitution. Upon this proposition all the authorities agree.' " (*People* v. *Galloway* (1927) 202 Cal. 81, 92 [259 P. 332]; and see *People* v. *Diaz* (1984) 152 Cal.App.3d 926, 933 [200 Cal.Rptr. 77], criticized on another point in *People* v. *Jackson* (1985) 168 Cal.App.3d 700, 704 [214 Cal.Rptr. 346].)

Actual bias, as defined in Penal Code section 1073, is "the existence of a state of mind on the part of the juror in reference to the case, or to either of the parties, which will prevent him from acting with entire impartiality

and without prejudice to the substantial rights of either party . . . ." ■ The existence of a trial juror's actual bias, if not discovered early, furnishes grounds for a new trial. (*People* v. *Galloway, supra,* 202 Cal. at pp. 93-94; Pen. Code, § 1181, subd. 3.)

Implied bias, as defined in Penal Code section 1074, includes among other things ". . . affinity within the fourth degree . . . to the defendant." ■ "Affinity has been defined as the 'connection existing, in consequence of marriage, between each of the married persons and the kindred of the other.' " (*Kest* v. *Lewis* (1959) 169 Ohio St. 317 [159 N.E.2d 449, 450].) "Degrees of relationship by affinity are computed as are degrees of relationship by consanguinity. The doctrine of affinity grew out of the canonical maxim that marriage makes the husband and wife one. The husband has the same relation, by affinity, to his wife's blood relatives as she has to them by consanguinity, and vice versa." (*State* v. *Hooper* (1934) 140 Kan. 481 [37 P.2d 52, 64].) ■ In circumstances of implied bias (such as affinity), "no proof of prejudice is required—it is inferred as a matter of law." (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 274 [148 Cal.Rptr. 890, 583 P.2d 748].)

In *Clark* v. *United States* (1933) 289 U.S. 1 [77 L.Ed. 993, 53 S.Ct. 465] it appeared that Clark, a prospective juror in a pending criminal case, on voir dire examination both concealed significant information and made a positive misstatement to the effect that her mind was free from bias. Clark was accepted as a trial juror. The original trial ended when the jury was unable to agree; the single vote for acquittal was cast by Clark. Subsequently Clark was prosecuted for contempt of court, convicted, and given imprisonment and a fine. The United States Supreme Court upheld the conviction. Justice Benjamin Cardozo, writing for a unanimous court, made these singularly salient observations: "There is a distinction not to be ignored between deceit by a witness and deceit by a talesman. A talesman when accepted as a juror becomes a part or member of the court. [Citations.] The judge who examines on the *voir dire* is engaged in the process of organizing the court. If the answers to the questions are wilfully evasive or knowingly untrue, the talesman, when accepted, is a juror in name only. His relation to the court and to the parties is tainted in its origin; it is a mere pretense and sham. What was sought to be attained was the choice of an impartial arbiter. What happened was the intrusion of a partisan defender. If a kinsman of one of the litigants had gone into the jury room disguised as the complaisant juror, the effect would have been no different. The doom of mere sterility was on the trial from the beginning." (*Id.,* at p. 11 [77 L.Ed. at p. 998].)

As to the prospective juror's concealment of material facts, Justice Cardozo wrote: "Whether this was perjury or false swearing, there is no occasion to inquire. It was a deliberate endeavor to thwart the process of inquiry, and to turn a trial into a futile form." (*Id.,* at p. 10 [77 L.Ed. at p. 998].)

But the precise question is before us in this case, and so we next consider the penal statute which Meza is alleged to have transgressed.

## IV.

Penal Code section 118 provides in pertinent part: "[¶] Every person who, having taken an oath that he will testify, declare, depose, or certify truly before any competent tribunal, officer, or person, in any of the cases in which such an oath may by law of the State of California be administered, willfully and contrary to such oath, *states as true any material matter which he knows to be false,* . . . is guilty of perjury." We have set forth in italics that portion of the statute upon which Meza here relies. It is Meza's position that in California the crime of perjury cannot be committed unless an audible false oral statement is made under oath, because under Penal Code section 6, "[n]o act or omission . . . is criminal or punishable, except as . . . authorized by this code . . . ."

The position finds some support in the case of *In re De Martini* (1920) 47 Cal.App. 228 [190 P. 468]. In that case a prospective juror affirmatively stated on voir dire that he would be guided solely by the evidence adduced in the case and by the instructions of the court. A subsequent indictment alleged that the juror's statements were false and amounted to perjury under Penal Code section 118. Faced with the indictment the juror applied to the Court of Appeal for a writ of habeas corpus. The appellate court denied the writ, saying this:

"The language of section 118 of the Penal Code is certainly broad enough to include the offense of perjury when committed by a prospective juror upon his *voir dire* examination, and to hold otherwise would certainly be to open the door wide to all form of collusion in the selection of jurors, if *false answers knowingly and corruptly made* under such circumstances can be given with impunity." (*Id.,* at p. 230, italics in original and supplied.)[4]

The strongest support for Meza's argument is found in *People* v. *French* (1933) 134 Cal.App. 694 [26 P.2d 310], where the defendant was accused of having committed perjury by submitting a false affidavit in order to obtain county relief work from the County of Los Angeles. The affidavit began, " 'I, James French, being first duly sworn, depose and say that . . . .' " (*Id.,* at

---

[4]De Martini subsequently was brought to trial and convicted of the crime of perjury. An appellate court reversed his conviction on two grounds: (1) it was not shown that De Martini, at the time he made his answers on voir dire, actually *knew* that he would not abide by the evidence, or that he harbored any animus against the defendant on trial; and (2) the corpus delicti of the crime of perjury had not been established independently of the admissions made by De Martini himself. (*People* v. *De Martini* (1920) 50 Cal.App. 109 [194 P. 506].)

p. 695.) Among other things, according to the information, " 'the defendant in said affidavit did wilfully and intentionally fail to state the nature, location and value of all property in which he the said defendant had any interest. . . .' " (*Id.,* at p. 697.) A demurrer to the information was sustained, the action was dismissed, and the People appealed. The Court of Appeal affirmed, holding that ". . . a criminal action for perjury will not lie for *failure to make an affidavit of facts* . . . ." (*Id.,* at p. 700, italics in original.) The court expressed its thoughts thus:

"It would seem so clear that discussion should be unnecessary either to illustrate or to establish the point that a criminal action against a defendant for the commission by him of the crime of perjury cannot be maintained on an allegation that in making an affidavit he *failed* to make a statement of any fact, however relevant or material such fact, if made, might be to the subject matter in hand, or however mandatory the rule might be by which he was directed or required to make such statement as a prerequisite to the accomplishment of the object of the affidavit." (*Id.,* at p. 699, italics in original.)

No authority was given for this proposition, and the passage we have quoted has not been cited or approved in any subsequent opinion in this state. On the other hand, to give the *French* opinion its due, to date it has not been criticized, questioned, or overruled.

We disagree with the bald assumption in *French* that silence can never amount to perjury, "however mandatory the rule might be" which requires disclosure. The rule which affords a criminal defendant a fair and impartial jury is of constitutional dimension, firmly planted in this nation's heritage, and is indisputably compelling. The reader still with us will recall that in 1872, when section 118 was placed in the Penal Code, collective questioning of prospective jurors was not allowed by statute; and until 1928, when collective questioning won grudging acceptance in the California Supreme Court, the practice was frowned upon in other appellate courts (See, e.g., *People v. Estorga, supra,* 206 Cal. at pp. 82-85; *People* v. *Adams* (1928) 92 Cal.App. 6, 18-19 [267 P. 906]; *People* v. *Edenburg* (1928) 88 Cal.App. 558, 563-565 [263 P. 857]; *People* v. *Riordan* (1926) 79 Cal.App. 488, 494-497 [250 P. 190].) Counsel were permitted to examine individual jurors, but when a challenge for cause was made the prospective juror had to be examined as a *witness* (Pen. Code, § 1081)—having sworn to tell "the truth, the whole truth, and nothing but the truth" (Code Civ. Proc., § 2094)—and the juror was obliged to "answer every question pertinent to the inquiry" (Pen. Code, § 1081). Upon a trial of a challenge for cause, the issue of whether a juror's silence constituted an "answer," or a "statement," simply never arose.

On the other hand, in the context of jury voir dire, the California Supreme Court long ago suggested that silence can amount to positive misconduct. In *People* v. *Galloway, supra,* 202 Cal. 81 , a prospective juror had a strong pretrial bias against any persons who imbibed alcoholic beverages, including the defendant; but she concealed that fact, and on voir dire examination stated (1) that she had no opinion one way or another as to the guilt or innocence of the defendant, and (2) that she thought her mind was open, and she knew of no reason why she could not give the defendant a fair and impartial trial upon the evidence. She was selected as a trial juror; the defendant was convicted and sentenced to death; his motion for a new trial was denied; and he appealed. The Supreme Court reversed, holding that a new trial should have been granted. Among other things the court acknowledged "a well-defined distinction which exists between a case where a juror was not interrogated upon the subject, or where he admitted his bias and expressed the belief that he could lay it aside, and a case where a juror *concealed* his prejudiced state of mind when examined on *voir dire* and entered upon the discharge of his duty as such juror while in such mental condition. In the second instance, *actual bias becomes, where concealed, positive misconduct and continues to be such throughout such juror's service on the case,* and if such misconduct is not known to the accused until after the trial and verdict, we see no reason whatsoever why the court should not have power to grant to the accused a new trial, basing it upon said subdivision 3 of section 1181 of the Penal Code. To use as an illustration an extreme situation: Suppose a juror had been actually corrupted; had corruptly agreed to vote for a verdict of guilty regardless of the evidence; had concealed this fact on his *voir dire* examination and had served as a juror, the facts respecting the situation being unknown to the accused during the trial and only discovered after verdict. Can it be said for a moment that a trial court would be without power to grant a new trial?" (*Id.,* at p. 91, italics in original and supplied.)

The foregoing language strongly suggests that in certain circumstances silence can be positive. The current Evidence Code makes the concept even plainer. The word " 'Conduct' includes all active *and passive behavior,* both verbal and *nonverbal.*" (Evid. Code, § 125, italics added.) The word " 'Statement' means (a) oral or written verbal expression or (b) *nonverbal conduct* of a person *intended by him as a substitute for oral or written verbal expression.*" (Evid. Code, § 225, italics ours.) Therefore silence (i.e., passive nonverbal behavior) may amount to a "statement" if it is intended so to be.

A trial court's collective voir dire of prospective jurors perceptibly provides a setting in which silence is taken for an answer. When the trial judge directs jurors having affirmative answers to raise their hands, he in effect directs those jurors having negative answers not to do so. In other words, in collective voir dire the trial court directs the *method* by which an

answer should be given. To those jurors who raise their hands the court directs specific questions. Then, typically, the trial court may say (as it did in this case), "Anybody else? I see no hands," and continue to the next general question. It is difficult to perceive how otherwise collective questioning could proceed expeditiously and efficiently.

In this case there was evidence before the magistrate sufficient to raise a strong suspicion that the trial judge in the Ramirez case—as well as the prospective jurors other than Meza—understood that silence would be taken for a negative answer, i.e., a negative statement.

When the trial judge asked if anyone on the jury panel knew the defendant Ramirez, did Meza intend his silence to mean "No"? We think this is a question for the trier of fact. ■ The crime of perjury requires proof that the perjurer acted with specific intent to make a false statement under oath. (*People* v. *Viniegra* (1982) 130 Cal.App.3d 577, 583-586 [181 Cal.Rptr. 848].) Whether a statement made under oath was willfully and intentionally false is a question of fact for the trier to determine. (*People* v. *Baranov* (1962) 201 Cal.App.2d 52, 58-59 [19 Cal.Rptr. 866].) If jurors are capable of deciding whether a false statement under oath was willfully made (cf. CALJIC No. 7.24 (1982 Rev.)), they are equally capable of deciding whether silence was intended to be a statement.

## V.

■ On appeal from an order setting aside an information, "the appellate court in effect disregards the ruling of the superior court and directly reviews the determination of the magistrate holding the defendant to answer." (*People* v. *Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278].) "[O]n review, every legitimate inference which can be drawn in favor of the information must be; and if the appellate court finds *some* evidence to support the commitment, it cannot inquire into the sufficiency of that evidence." (*People* v. *Mardian* (1975) 47 Cal.App.3d 16, 38 [121 Cal.Rptr. 269], italics in original.)

■ Here the evidence before the magistrate showed (1) that Meza stood in a relationship of "affinity within the fourth degree" (in fact within the second degree) to the defendant Ramirez (Pen. Code, § 1074, ¶ 1); (2) that as a prospective juror Meza took an oath to answer "well and truly" questions asked concerning his qualifications as a trial juror; (3) that all of the prospective jurors, including Meza, were asked specifically whether they knew the defendant Ramirez; (4) that Meza said nothing, and failed to raise his hand; and (5) that the circumstances were such that a reasonable man would have realized that silence and inaction would be interpreted as a negative

response. From such evidence "the magistrate, acting as a person of ordinary caution or prudence, could conscientiously entertain *a reasonable suspicion* that a public offense had been committed in which the defendant had participated." (*People* v. *Park* (1978) 87 Cal.App.3d 550, 561, italics in original [151 Cal.Rptr. 146].) "[A]n information will not be set aside if there is some rational ground for assuming the *possibility* that an offense has been committed and the accused is guilty of it." (*Id.,* at pp. 560-561, italics in original.)

## VI.

We do not decide the question of whether Meza's admissions to the trial judge were elicited in violation of any constitutional rights. From all that appears in the record, in setting aside the information the court below disregarded those statements, and considered only Meza's conduct on voir dire. Lacking a superior court ruling on the point, the question is not properly before us.

Like reasoning persuades us not to decide whether Meza committed perjury by (a) intimating that he could be a "fair" juror, or (b) guaranteeing not to come to a decision until all of the evidence was in. In each instance he made an audible response. But the *falsity* of those responses was demonstrated by the record of Meza's later admissions to the trial judge. If one disregards the admissions, there was no evidence before the magistrate showing that Meza's oral responses were false.

## VII.

We do not mean to suggest that silence may always be taken to be the equivalent of a negative answer, or that silence may always form the basis of a charge of perjury. We expressly limit our decision to the factual situation before us—i.e., a collective voir dire of prospective jurors sworn to answer questions truthfully, where silence means "No." Our decision is based solely upon Meza's concealment of his relationship to the defendant Ramirez.

The order setting aside the information is reversed.

Agliano, P. J., and Capaccioli, J., concurred.

Respondent's petition for review by the Supreme Court was denied April 23, 1987. Mosk, J., was of the opinion that the petition should be granted.

Pages 126-171:

[1]Review granted. See 43 Cal.3d 1002 for Supreme Court opinion.
[2]Deleted on direction of Supreme Court by order dated April 16, 1987.
[3]Review granted. See 44 Cal.3d 242 for Supreme Court opinion.
[4]Deleted on direction of Supreme Court by order dated March 5, 1987.

Pages 481-506:

[1]Review granted. Reprinted without change in 198 Cal.App.3d 274, to permit tracking pending review by the Supreme Court.
[2]Deleted on direction of Supreme Court by order dated March 18, 1987.

Pages 970-1003:

[1]Deleted on direction of Supreme Court by order dated April 2, 1987.
[2]Review granted. See 44 Cal.3d 839, for Supreme Court opinion.