[No. S056082. Aug. 21, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
ELLENA STARR NESLER, Defendant and Appellant.

564

## Counsel

Paul Couenhoven, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, W. Scott Thorpe, Stan Cross and Janet E. Neeley, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

GEORGE, C. J.—In a Tuolumne County courtroom, during a break in Daniel Driver's preliminary hearing on charges of sodomizing her seven-year-old son, defendant Ellena Starr Nesler shot and killed Driver. A jury found defendant guilty of voluntary manslaughter with the use of a firearm, thereafter deciding that she was sane at the time of the commission of the offense. The Court of Appeal affirmed defendant's conviction. We granted review to determine whether defendant was prejudiced by juror misconduct that occurred during the sanity phase of the trial. Because we determine that the presumption of prejudice arising from the misconduct was not rebutted, we conclude that the judgment of the Court of Appeal with respect to the sanity phase must be reversed.

I

In order to place defendant's claim of juror misconduct in context, we summarize the evidence leading to her conviction, with particular emphasis upon issues related to the alleged misconduct. Because the misconduct occurred during the sanity phase of the trial, pertinent portions of the expert testimony concerning her mental state are set forth in some detail. Finally, we describe the evidence that the trial court received from the jurors in connection with defendant's motion for a new trial, as well as the lower courts' analyses of defendant's argument that she was denied a fair trial because of juror misconduct.

A. *Guilt Phase*

During the guilt phase of the trial, the parties presented evidence of the following facts, which are essentially undisputed for purposes of this appeal.

Daniel Driver allegedly raped defendant's son, W., at a Christian camp where Driver worked. Driver told W., who was then seven years of age, that Driver would kill him, his sister, and defendant if W. told anyone what had happened. Several months later, W. disclosed to defendant what Driver had done. In May 1989, a complaint was filed against Driver, alleging seven counts of child molestation involving four boys, including W. Driver, however, had fled and was not apprehended until late 1992 or early 1993.

During this period, W. became hypervigilant and expected Driver to kidnap and kill him. He also began asking defendant questions about suicide, and once defendant found him with a gun. Fearing that W. would kill himself, she obtained counseling for him. Defendant told her sister, Jannette Martinez, that when defendant was a child she had been raped in the same manner as W., and that there was a time when she, too, wanted to die.

Before Driver's preliminary hearing took place in April 1993, defendant protested when she learned that W. would have to face Driver at the hearing. She suggested videotaping W.'s testimony, but that alternative was unavailable; defendant then asked that the hearing at least be closed to the public. On the morning of the hearing, W. began vomiting and continued to do so after he arrived at the courthouse. Defendant appeared nervous, upset, and extremely anxious about W. She told an investigator that W. might not be able to testify, and she attempted to reassure and encourage the boy. When Driver arrived at the courthouse for the hearing, he looked at W. and grinned with a mean, disgusted, and haughty look. Defendant lunged for Driver, but Martinez grabbed her arm. Defendant again asked someone from the district attorney's office whether the courtroom could be closed, but an open hearing was held.

After W. entered the waiting room for witnesses, he continued to vomit. The mother of one of the other boys said that she did not believe her testimony had gone well, and that Driver had smirked at her and her son when they testified. This woman also said that she was convinced Driver was "going to walk," and that she wanted to get a gun and kill him. She told defendant to try to do better than she and her son had done. After this exchange, defendant became nervous and started pacing.

Defendant and W. were to be the last witnesses to testify at the preliminary hearing. Just before they were called, defendant asked the investigator whether he and other employees in the district attorney's office would get in trouble if "something happened" to Driver. Believing that defendant was referring to a previous assault upon Driver by another inmate in the jail, the investigator gave a negative response. Defendant and Martinez entered the courtroom, and the prosecutor told them to take a seat. The judge was not

present, and a shackled Driver was sitting in a chair approximately one foot from defense counsel. Defendant stood behind the defense attorney, drew a gun she had taken from Martinez's purse, and shot Driver five times in the left side of the head and neck; a sixth bullet missed Driver and was found in the wall. The gun's muzzle was within two to three feet of Driver's head, and the shots were fired in rapid succession. Driver was killed almost instantly.

Defendant was taken into custody. She remarked, "You don't understand. He has raped hundreds of boys." The same day, in a tape-recorded statement, defendant said that she had not intended to kill Driver at the hearing and did not know whether she had done the right thing, but was tired of all of the pain Driver had caused, and that he deserved to die. Defendant thought that W.'s pain had destroyed her sense of right and wrong. She said that when Driver smirked at her son outside the courthouse, she would have killed him right there had she already taken possession of the gun.

In the taped statement, defendant denied having used any drugs or alcohol that day. After the tape recorder was turned off, however, she admitted that she had "done crank" once that morning. While being transported to have a blood sample taken, defendant again admitted having taken methamphetamine that morning but said she did not use it all the time. The blood sample revealed a concentration of the drug in defendant's blood that might be seen in someone who had taken substantial doses during the previous one to three days.

After completion of the guilt phase of the trial, the jury found defendant not guilty of first or second degree murder, but returned a verdict of guilt on the lesser included offense of voluntary manslaughter, and also found true an allegation that defendant had used a firearm in the commission of the offense.

## B. *Sanity Phase*

During the sanity phase of the trial, three defense experts testified that defendant was legally insane at the time of the shooting. Two diagnosed defendant as suffering from post-traumatic stress disorder resulting from her own sexual abuse suffered as a child and as a young woman, and from Driver's molestation of W. They stated that the emotional events on the day of the hearing led her to act in a manner that she believed was appropriate but that was inconsistent with socially accepted moral standards. The experts testified that defendant misperceived reality in that she believed the authorities were aware of what she was going to do, wanted her to kill Driver, and facilitated her act. Thus, for example, defendant interpreted the investigator's comment that no one would get in trouble if something happened to

Driver, and the circumstance that the courtroom was almost empty when she entered, as signs that the authorities wanted her to kill him. One expert concluded that, in response to the emotionally overwhelming events that occurred on the day of the homicide, defendant suffered a brief reactive psychosis causing her to operate in a delusional manner and to lose the ability to distinguish moral right from moral wrong. All three concluded that, because of these and other mental disorders with which defendant was diagnosed, she was unable at the time of the killing to discern what was the generally accepted moral standard of right and wrong.

Two of the defense experts did not consider defendant's drug use to be particularly relevant to her mental state existing at the time she killed Driver. The other, psychologist Philip Trompetter, diagnosed defendant as suffering from amphetamine intoxication and psychoactive substance abuse at the time of the shooting. Dr. Trompetter testified defendant had reported that she started using methamphetamine in the fall of 1992 and used it on approximately 20 occasions, the last 2 of which were the night before the preliminary hearing and the morning of the hearing. Defendant suggested to him that the shooting never would have happened had she not had the drug in her system, because it caused her to have a false sense of reality and to do things she ordinarily would not have done. On cross-examination, Dr. Trompetter testified that he had received information from the Department of Justice indicating that other individuals had reported seeing defendant snorting crank in 1989, "as well as some other information about drug sales." The court granted defendant's motion to strike the reference to drug sales and instructed the jury to disregard it because it was multiple hearsay and, even if true, was irrelevant to any issue the jury had to decide.

In making his diagnosis of post-traumatic stress disorder, Dr. Trompetter noted that defendant had become protective of others and hypervigilant about the safety of her own children, and in particular about protecting them from abuse. He stated: "[S]he would usually not have baby-sitters, and would have a family member baby-sit the kids. [¶] I think she was very concerned that these children could be abused. . . . [¶] Despite her protective efforts, [W.] was profoundly violated. . . . [¶] This, in itself, became a secondary traumatic stress for her, and, I believe, the most significant stress for her. I think she started to feel . . . [t]he guilt of her failing to protect her son, I think that just rearoused all kinds of feelings toward her parents and related to her own molest . . . ."

Dr. Trompetter proceeded to describe the events leading up to the homicide. He then testified: "I think that her primary reason for wanting to kill Daniel Driver was the thought of him being released and her son having to worry about this man being on the loose and for [W.] to have to continue

looking in the shadows and seeing vehicles and worrying about what Daniel Driver was going to do to him. [¶] In my judgment . . . , that was the predominant factor that triggered her impulse to kill Daniel Driver." Dr. Trompetter admitted on cross-examination that defendant told him that she had considered putting W. in a foster home, and that she went through a period before the trial in which she hated W. He explained, however, that defendant considered placement in a foster home because of how protective and concerned she was, and he reiterated that she protected her children by not having babysitters. According to Dr. Trompetter, the combination of defendant's mental disorders, drug use, and the circumstances existing on the day of the hearing, made it impossible for her to discern whether the act of killing Driver was morally right or wrong.

Four experts testified for the prosecution that defendant was legally sane at the time of the homicide. One diagnosed defendant as suffering from post-traumatic stress disorder and amphetamine abuse. He could not rule out amphetamine intoxication but opined that defendant retained the basic capacity to recognize the moral wrongfulness of her actions. Another expert testified that defendant's attention-deficit disorder and amphetamine intoxication may have increased her level of impulsivity but did not affect her capacity to think or act rationally. A court-appointed psychiatrist stated that this was a difficult and close case and that he struggled in reaching his opinions. Although some of defendant's statements could be interpreted as indicating that defendant in committing the homicide did not make a moral decision, this psychiatrist ultimately concluded that she was legally sane.

Dr. Reese Jones, a psychiatrist specializing in psychopharmacology, offered his opinion concerning the effect of defendant's methamphetamine use upon her mental state at the time of the killing. Specifically, Dr. Jones testified as to whether, in view of the concentration of methamphetamine found in defendant's blood, the drug significantly had altered or produced defendant's behavior. He stated that in order to resolve this issue, he would have to know whether defendant's blood level was produced by one dose of the drug, or by regular use over a period of weeks, months, or years. Dr. Jones explained that a person having a blood level like defendant's, but who is inexperienced with taking methamphetamine, can develop a psychotic state as a result of ingesting that drug and become delirious or delusional. After reviewing descriptions of her behavior on the day of the homicide, however, he found that the drug's effect on defendant was much less than he would expect in a person with her blood level. Dr. Jones found insufficient indications that defendant was in a psychotic or delusional state. He determined that defendant behaved like a person who was cognitively aware and oriented and who could understand the moral implications of what she did.

Following the presentation of evidence at the sanity phase of the trial, the jury was instructed, among other things, not to consider for any purpose any

evidence that was stricken by the court, and not to consider or discuss facts as to which there was no evidence. Regarding defendant's sanity, the court instructed: "If a mental illness is manifested in delusions which render the individual incapable either of knowing the nature and character of her act or of understanding that it is wrong, she is legally insane. . . . If you find that due to a mental disease or defect the defendant was incapable of understanding that her act was morally wrong, she is not criminally liable merely because she knew the act was unlawful."[1]

After deliberating for one week, the jury found that defendant was sane.

## C. *Motion for New Trial*

Defendant moved for a new trial, on the issues of both guilt and sanity, on the ground of juror misconduct. She asserted that during voir dire, Juror Katherine Elizabeth Boje concealed biases and prejudices based upon previously formed opinions or previously acquired information concerning defendant. In addition, defendant contended that during deliberations in the sanity phase of the trial, Boje revealed to other jurors information she had obtained outside of court. The declarations of several jurors were submitted in support of and in opposition to the motion. At a subsequent evidentiary hearing on the motion, held in chambers, the jurors testified concerning the events giving rise to defendant's claim of juror misconduct.

### 1. *Evidence of Juror Misconduct*

#### (a) *Mary Ulvevadet*

In a declaration filed in support of the motion for new trial, Juror Mary Ulvevadet stated that during deliberations in the sanity phase of the trial, she heard Juror Boje say in the presence of other jurors that she knew defendant's babysitter. This babysitter had told Boje that defendant frequently would leave her children unattended and that defendant was not a good mother. Boje further stated that defendant did not love her children, that defendant was "a 'crankster' (referring to the use of methamphetamine)," and that someone who loves her children does not use such drugs. Boje also said that she (Boje) had ingested methamphetamine herself and can tell when someone has done so, and that defendant "fell into this category." Boje stated that defendant's friends frequent the restaurant where Boje works, that they are illicit drug users, and that Boje knows that defendant sells drugs. Boje made comments to this effect at least once each day as the jury deliberated during the sanity phase.

At the evidentiary hearing on defendant's motion for new trial, Juror Ulvevadet repeated and further explained much of what was set forth in her

---

[1]We have no occasion to consider the propriety of this instruction.

declaration. Ulvevadet testified that during deliberations at the sanity phase of the trial she was seated across the table from Boje. On more than one occasion, when the issue of defendant's parenting skills was being discussed among the jurors, Boje said that defendant was not a good mother. For example, Boje stated that she knew defendant's babysitter, who said that defendant "would leave the kids for periods of time and that it was not true that [defendant] didn't use baby-sitters because [Boje] knew this baby-sitter and she watched her kids all the time." In addition, Boje suggested that defendant should have obtained counseling for her children sooner, and she cited defendant's poor parenting skills as proof that she did not love her children. On at least one of these occasions, Boje prefaced her remarks with the comment, "I know I shouldn't be saying this because, you know, it wasn't presented . . . ."

Ulvevadet testified that Boje would make these statements when jurors were arguing a point during deliberations: "[I]f one of us was bringing up an issue . . . she would get to the point she'd get real impatient with our trying to make a point that enough evidence hasn't been brought forward to substantiate something. Then she would interject her comment . . . , and if she wasn't making direct out loud comments she would . . . just gesture and shake her head and she had made the comment . . . 'that if we knew what she knew then we would know different,' something to that effect. . . . And [Boje] made the statement that . . . '[i]f '—'after the trial we would know and we gotten [*sic*] the real truth that it would come out that [defendant] is not the angel everyone is painting her to be.' "

At various times when Boje or other jurors made comments concerning matters outside the evidence, the rest of the jury would remind them that they could consider only what was received in evidence. When Boje made comments under her breath, however, she would not be corrected.

In addition to the foregoing testimony, Ulvevadet stated that when the jury was deliberating about the extent of defendant's methamphetamine use, how long she had used the substance, and the effect it might have had on her, Boje referred to defendant as a "crankster." Boje said that defendant's friends frequent the restaurant where Boje works, and that Boje has some interaction with them and "knows for a fact they deal drugs" and that defendant and her sister "used drugs and sold in that group . . . ." Boje did not say that she knew specifically that defendant sold drugs.

Ulvevadet testified that as the jury deliberated whether defendant was sane at the time of the homicide, "I was making headway, and at least getting . . . the opposing side to at least deliberate the point which we were asked to go deliberate. And [Boje], as each day passed, became more

aggressive in her comments and her shrugs and her just kind of—just getting more and more put out with us. . . . I remember looking up and . . . [Boje] would comment under her breath. . . . I really felt that it . . . had gone beyond an occasional, you know, intentional comment. It was viciousness on her part. More just her inability to not bring up stuff she had no business bringing up. And I didn't have any reason to believe there might have been any—like I say, real intentional maliciousness until [Juror Carmilla Hazelwood] told me . . . that coming down from the [sanity] verdict being read [Boje] had told her—made the comment, 'The bitch finally got what she deserved.' "

### (b) Katherine Boje

Juror Boje's declaration submitted in opposition to defendant's motion for new trial stated that a few times during deliberations, one juror or another would mention a rumor he or she had heard about defendant, but other jurors would remind everyone that deliberations were to be based solely on the evidence. Boje had no special knowledge about defendant or this case from any specific source outside of the trial. Boje may have made comments that she believed defendant regularly used drugs and was a poor mother, but those comments were based on evidence presented at the trial.

At the evidentiary hearing, Boje testified that she is not acquainted with defendant's babysitter and does not know her name. During the sanity phase of the trial, Boje went into a tavern and sat down at the bar. A woman sitting about two-thirds of the bar's length away from Boje said that she knew defendant and had babysat defendant's children. The woman said that defendant had used illegal drugs, had left her children on several occasions, and then had not come home, sometimes for days at a time. The woman was not speaking to Boje or to anyone else in particular, but rather to anyone who would listen, and she made derogatory comments concerning defendant for approximately half an hour. Boje did not respond to any of these comments or identify herself as a juror, and it did not occur to Boje to leave. At some point Boje went to the restroom, and when she returned the woman was gone.

Boje further testified she told the other jurors that a woman in a bar had said she was defendant's babysitter, and that the woman was drunk. Boje denied saying anything to the other jurors about defendant going off and leaving her children, and she stated that the jury did not discuss defendant's parenting skills. Later Boje admitted that, based upon what the woman said at the bar, she told other jurors that she had heard that defendant left her children with the babysitter for days at a time. Boje denied making any kind of statement that she thought defendant was in any way a bad mother. When

confronted with her declaration that she may have described defendant as a poor mother, Boje testified that she might have made such a comment but did not recall. In the event defendant's parenting skills were brought up, the jury would have put that aside, because "that wasn't part of the issues . . . [or] the process of coming to our verdict at all."

Boje denied ever referring to defendant as a "crankster," which she defined as a person who habitually uses crank, or commenting that defendant ingested more illicit drugs than was shown by the evidence. When impeached by defense counsel with her declaration that she may have commented that defendant regularly used drugs, Boje admitted she may have made such a statement. If she did, it was not because of what the babysitter said, but rather "because it just seems very strange on the one day you're going to Court to be supportive, you do drugs. A lot of jurors have a lot to say about that. We couldn't get the information, because it wasn't brought out." Boje disclaimed having any knowledge that individuals who she understands to be drug dealers frequent the restaurant where she works. Boje also denied telling jurors that if they knew what she knew, they would feel differently about the case. Finally, Boje denied saying to any other juror, "The bitch finally got what she deserved."

### (c) *Other jurors*

Juror Carmilla Hazelwood testified that, during deliberations, Boje said she knew defendant had a babysitter and would leave her children for days at a time. Boje also said defendant was a bad mother, called defendant a "crankster," and said Boje could tell whether a person was using drugs. Boje made these comments while the jury was discussing whether defendant was a good mother. Hazelwood emphasized that when jurors brought up information not part of the evidence presented at trial, the rest of the jury immediately would say they could not discuss it. She could not hear everything Boje said in the jury room, because Boje "mumbled and sometimes said things under her breath."

Hazelwood did not recall Boje referring to information concerning defendant's drug use other than the evidence presented at trial, although she did recall that Boje commented she could tell that defendant was a "crankster." Boje made this statement as the jury was attempting to determine whether defendant had used drugs only on this one occasion, "like they tried to show through testimony, or whether this was built up in her system over a long period of time, which Reese Jones [the psychopharmacology expert] tried to show . . . ."

Hazelwood testified that after the jury rendered its verdict and the jurors had gone to retrieve their belongings from the jury deliberation room,

she heard Boje make the comment, " 'Well, that bitch,' either, 'finally got what she deserved,' or, 'got what she deserved,' something to that effect." Boje never used the term "bitch" when referring to defendant during deliberations.

Juror Barbara Cooper testified Boje said that she knew defendant's babysitter, and that the babysitter had said defendant would go off and leave her son for a day or two at a time and not come back. Boje made such comments in outbursts as the jury was arguing about whether defendant was a good mother or how important her role as a mother was to her. In addition, while the jury was deliberating as to whether defendant's drug use was chronic and what role it had played, Boje stated that she knew defendant had a history of drug use, that Boje knew or had spoken with defendant's drug dealer, and that defendant was involved in the use of methamphetamine to a greater degree than was disclosed by the evidence.

Four other jurors declared and/or testified that during deliberations, Boje stated that she knew defendant had a babysitter. Three of those jurors also stated that Boje said defendant was a bad mother. Two jurors stated that Boje said she knew defendant used more drugs than was demonstrated at trial, and one testified that Boje told the jury that she knew defendant's friend was a drug dealer.

### 2. Ruling on Motion for New Trial

The trial court denied defendant's motion for new trial in an 18-page written order. After summarizing the foregoing evidence, the court made the following findings of fact.

During the sanity phase of the trial, Boje received information concerning defendant from a source outside the trial. She did not disclose the information or its source to the court. The source of the information was the woman she had encountered in the bar who made various comments concerning defendant, including statements that the woman had been a babysitter for defendant's children, that defendant left her children for long periods of time, that defendant is not a good mother, and that defendant used illicit drugs. During deliberations, Boje stated she knew defendant's babysitter, and passed along information she had received from the woman she had encountered in the bar. Boje did not tell the other jurors that her information came from "a stranger sounding off in a bar." She implied to other jurors that she had information concerning defendant, defendant's family, and defendant's associates that other jurors did not have. In addition, during deliberations Boje referred to defendant as a "crankster" and stated that defendant used methamphetamine more than the evidence showed. Boje's

statements based upon outside information were made during periods of deliberations in the sanity phase when she was in disagreement with views offered by other jurors on those matters, either in outbursts or in statements under her breath that were heard by only one or a few jurors. Finally, Boje stated after the trial, "The bitch got what she deserved."[2]

In ruling on defendant's motion for new trial, the trial court considered three issues: (1) whether during voir dire Boje intentionally concealed information concerning her prior knowledge of the case; (2) whether the outside information she disclosed to other jurors was inherently likely to have influenced the vote of one or more jurors; and (3) whether Boje's statement that defendant received what she deserved proved that Boje had prejudged the case.

Although the trial court acknowledged that on some points it found the testimony of other jurors more credible than that of Boje, it accepted Boje's testimony that the only source of her outside information was the woman in the bar whom she encountered during the sanity phase of the trial. Therefore, in answer to the first question, the trial court concluded that during voir dire Boje did not conceal information involving prior knowledge of the case from another source.

Regarding the second question, the trial court considered whether Boje's disclosure of information concerning either defendant's drug use or her abilities as a mother was inherently likely to have influenced the vote of any juror in the case. According to the trial court, defendant's drug use or involvement in drug activity on any day other than the day of the shooting was both immaterial and irrelevant to the issues the jury was instructed to decide. The trial court acknowledged that Boje's statements about defendant's use of a babysitter and leaving her children did tend to contradict evidence presented at trial that defendant is protective of her children and was reluctant to leave them with babysitters. The trial court nonetheless concluded that the parenting issue was "so remote from the issues in the sanity phase" that Boje's statements were not inherently likely to have influenced the vote of any juror. Therefore, the trial court determined that the presumption of prejudice arising from Boje's disclosure of extraneous information to other jurors was rebutted.

The trial court's only inquiry regarding the question of Boje's actual bias was whether her postverdict statement, "The bitch got what she deserved,"

---

[2]The trial court also found that during the trial Boje had a conversation with a man alleged to be defendant's ex-boyfriend, but that she did not discuss the case or defendant with him. Defendant does not contend in this court that Boje's conversation with this man amounted to juror misconduct.

standing alone, proved that Boje had prejudged the case. The trial court concluded that there was no ground for concluding that this statement was based upon anything other than Boje's view of the evidence in the case. It noted that she never used that term during deliberations but that, according to other jurors, Boje customarily used coarse language. Thus, the trial court found that Boje's use of the word "bitch" was not an indication of prejudgment of, or hatred or passion against, defendant.

### 3. *Court of Appeal Decision*

The Court of Appeal upheld the trial court's decision denying the motion for new trial. It first determined that substantial evidence supported the trial court's finding that Boje did not conceal material information on voir dire. Next, the Court of Appeal concluded that Boje committed misconduct by receiving information from a source outside the court proceedings and then repeatedly sharing "rumors" and her purported knowledge with fellow jurors, despite their admonitions that the information could not be considered. The Court of Appeal then proceeded to decide whether the presumption of prejudice arising from such misconduct was rebutted.

The appellate court engaged in a two-part inquiry to determine whether the presumption of prejudice had been rebutted. First, it considered whether the extrajudicial information disclosed by Boje was substantially likely to have influenced any juror. Because the Court of Appeal found that the trial record is "replete" with evidence strongly suggesting that defendant used illicit drugs other than on the date of the shooting, it determined that no juror was likely to have been influenced by Boje's references to defendant's drug use. Regarding information about defendant's skills as a mother, the Court of Appeal acknowledged that defendant's protective tendencies toward her children were relied upon in the formulation of expert opinions concerning her sanity at the time of the shooting. According to the appellate court, however, whether defendant employed a babysitter "was but a small part of the experts' opinions." Therefore, it concluded that the presumption of prejudice arising from the jury's receipt of extrajudicial information was rebutted.

The second step in the Court of Appeal's prejudice analysis was to analyze whether the record established that it was substantially likely Boje was actually biased against defendant. Regarding Boje's statement, "The bitch got what she deserved," the Court of Appeal concluded that the timing of the statement and the circumstance that Boje did not refer to defendant as a "bitch" during the trial strongly suggested that Boje was not actually biased and had not prejudged the case. The court further determined that

Boje's sharing of extrajudicial information with other jurors, even when considered in conjunction with her postverdict statement, did not establish actual bias. The Court of Appeal reasoned: "Her misconduct consisted, essentially, of hearing and passing along rumors concerning appellant. According to [Ulvevadet], [Boje] herself acknowledged that information not presented at trial should not be discussed, and other jurors reminded her not to consider such information on numerous occasions. The information added little to the evidence presented at trial. Significantly, [Boje] herself knew the source was the woman in the bar, even if she did not share this tidbit with her fellow jurors. She testified she assumed the woman was drunk, as this person did not know the name of [defendant's] daughter, thus further discounting the likelihood [Boje] was actually influenced by the woman's statements." The Court of Appeal was convinced by its review of the entire record that there was no substantial likelihood that defendant suffered actual harm from juror misconduct. Accordingly, it held that the presumption of prejudice had been rebutted.[3]

This court granted defendant's petition for review, limiting the issue to be argued to that of juror misconduct. (Cal. Rules of Court, rule 29.2(b).)

## II

■ Defendant does not contend that the lower courts erred in concluding that Boje's misconduct was not substantially likely to have influenced the vote of other jurors. She argues, instead, that Boje's receipt of the extraneous information and her statements during deliberations at the sanity phase establish a substantial likelihood that Boje herself was influenced by exposure to prejudicial extrajudicial information and, therefore, that she was actually biased. According to defendant, the Court of Appeal mischaracterized Boje's misconduct and failed to consider several circumstances in analyzing the issue. She maintains that when all of the surrounding circumstances properly are considered, it cannot be reasonably concluded that the presumption of prejudice arising from Boje's misconduct was rebutted. The Attorney General, on the other hand, argues that any extraneous information received and disclosed by Boje was cumulative to evidence presented at the trial or irrelevant to the issues being decided by the jury and thus did not influence Boje. According to the Attorney General, the trial court made a factual finding that Boje was not actually biased—a finding that should be

---

[3]In addition to analyzing the jury misconduct issue, the Court of Appeal also rejected defendant's contention that the trial court had erred by giving heat-of-passion manslaughter instructions, because there assertedly was insufficient evidence of provocation to negate malice. The Court of Appeal concluded that there was sufficient evidence to support such an instruction.

accorded deference on appeal. As we shall explain, we agree with defendant's position.

█ A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors. (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 16; *Irvin* v. *Dowd* (1961) 366 U.S. 717, 722 [81 S.Ct. 1639, 1642, 6 L.Ed.2d 751]; *In re Hitchings* (1993) 6 Cal.4th 97, 110 [24 Cal.Rptr.2d 74, 860 P.2d 466].) A defendant is "entitled to be tried by 12, not 11, impartial and unprejudiced jurors. 'Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced.' [Citations.]" (*People* v. *Holloway* (1990) 50 Cal.3d 1098, 1112 [269 Cal.Rptr. 530, 790 P.2d 1327], disapproved on other grounds in *People* v. *Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588].)

█ Juror misconduct, such as the receipt of information about a party or the case that was not part of the evidence received at trial, leads to a presumption that the defendant was prejudiced thereby and may establish juror bias. (*People* v. *Marshall* (1990) 50 Cal.3d 907, 949-951 [269 Cal.Rptr. 269, 790 P.2d 676]; *In re Carpenter* (1995) 9 Cal.4th 634, 650-655 [38 Cal.Rptr.2d 665, 889 P.2d 985].) "The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury. . . . [¶] In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." (*Turner* v. *Louisiana* (1965) 379 U.S. 466, 472-473 [85 S.Ct. 546, 549-550, 13 L.Ed.2d 424], citations and fn. omitted.) As the United States Supreme Court has explained: "Due process means a jury *capable and willing to decide the case solely on the evidence before it . . . .*" (*Smith* v. *Phillips* (1982) 455 U.S. 209, 217 [102 S.Ct. 940, 946, 71 L.Ed.2d 78], italics added, quoted in *In re Carpenter, supra*, 9 Cal.4th at p. 648; accord, *Dyer* v. *Calderon* (9th Cir. 1997) 113 F.3d 927, 935; *Hughes* v. *Borg* (9th Cir. 1990) 898 F.2d 695, 700.)

█ We assess the effect of out-of-court information upon the jury in the following manner. When juror misconduct involves the receipt of information about a party or the case from extraneous sources, the verdict will be set aside only if there appears a substantial likelihood of juror bias. (*In re Carpenter, supra*, 9 Cal.4th at p. 653.) Such bias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in

and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not "inherently" prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was "actually biased" against the defendant. If we find a substantial likelihood that a juror was actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict, because a biased adjudicator is one of the few structural trial defects that compel reversal without application of a harmless error standard. (*Id.* at pp. 653-654.)

 The trial court's findings and Boje's own testimony establish that Boje engaged in the following misconduct. Boje sat in a bar while a woman revealed damaging information about defendant for half an hour. Boje did not identify herself as a juror, and it never occurred to her to leave. She did not disclose the outside information or its source to the court. Instead, Boje violated her oath and disregarded the trial court's instructions by revealing this information to other jurors. These disclosures were made during deliberations, at a time when she disagreed with other jurors, in an apparent attempt to persuade them to change their views. Boje knew she should not discuss information that was not part of the evidence presented at the trial and was reminded repeatedly by other jurors not to do so.

The Attorney General does not dispute that Boje committed misconduct by disclosing outside information to her fellow jurors, but argues in passing that Boje's receipt of the information from the woman in the bar was "innocent and inadvertent" and therefore did not constitute misconduct. On numerous occasions, however, we have concluded that a juror's inadvertent receipt of information that had not been presented in court falls within the general category of "juror misconduct." (*People* v. *Zapien* (1993) 4 Cal.4th 929, 994 [17 Cal.Rptr.2d 122, 846 P.2d 704] ["inadvertent receipt of information outside the court proceedings is considered 'misconduct' "]; *People* v. *Lucas* (1995) 12 Cal.4th 415, 486-487 [48 Cal.Rptr.2d 525, 907 P.2d 373] [same]; *People* v. *Cummings* (1993) 4 Cal.4th 1233, 1331 [18 Cal.Rptr.2d 796, 850 P.2d 1] [inadvertent reading of newspaper article relating to trial constitutes misconduct]; *People* v. *Holloway, supra*, 50 Cal.3d at p. 1110 [same].) Although inadvertent exposure to out-of-court information is not blameworthy conduct, as might be suggested by the term "misconduct," it nevertheless gives rise to a presumption of prejudice, because it poses the risk that one or more jurors may be influenced by material that the defendant has had no opportunity to confront, cross-examine, or rebut. The cases upon which the Attorney General relies, and which he claims conflict with the foregoing decisions, are distinguishable, and we have no occasion to consider their application to this case.

None of them involved the improper receipt of *outside* information, as did the present case; rather, court officials furnished the jury with material that should not have been transmitted to them.[4] In any event, Boje's decision to stay in the bar for half an hour and continue to listen to the woman's remarks concerning defendant cannot be considered inadvertent. Moreover, her subsequent failure to disclose the information to the court and her intentional use of the information during deliberations are more than adequate to establish serious misconduct.

■ Having determined that Boje committed misconduct, we next consider the effect of that misconduct upon defendant's right to a trial by 12 impartial jurors. As noted, defendant does not contend that the information Boje discussed during deliberations was so inherently prejudicial that by its very nature the information was likely to have influenced the vote of other jurors. Instead, she argues that Boje's use of that information during deliberations demonstrates that it is substantially likely Boje herself was actually influenced by the extrajudicial information and, therefore, was actually biased.

■ What constitutes "actual bias" of a juror varies according to the circumstances of the case. (*In re Carpenter*, *supra*, 9 Cal.4th at pp. 653-654.) In assessing whether a juror is "impartial" for federal constitutional purposes, the United States Supreme Court has stated: "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." (*United States* v. *Wood* (1936) 299 U.S. 123, 145-146 [57 S.Ct. 177, 185, 81 L.Ed. 78) " 'The theory of the law is that a juror who has formed an opinion cannot be impartial.' [Citation.] [¶] It is not required, however, that the jurors be totally ignorant of the facts and issues involved. . . . It is sufficient if the juror can lay aside his impression or

---

[4]The cases upon which the Attorney General relies are *People* v. *Jackson* (1996) 13 Cal.4th 1164, 1213-1214 [56 Cal.Rptr.2d 49, 920 P.2d 1254] (unedited version of transcript); *People* v. *Clair* (1992) 2 Cal.4th 629, 667-668 [7 Cal.Rptr.2d 564, 828 P.2d 705] (unredacted audiotape recording and transcript); *People* v. *Cooper* (1991) 53 Cal.3d 771, 835-836 [281 Cal.Rptr. 90, 809 P.2d 865] (exhibit inadvertently admitted into evidence); and *People* v. *Rose* (1996) 46 Cal.App.4th 257, 264 [53 Cal.Rptr.2d 559] (excluded police report inadvertently received by jury). Cf. *Hughes* v. *Borg*, *supra*, 898 F.2d 695, 699-700 & fn. 4 (consideration of police report inadvertently admitted into evidence is misconduct). The Attorney General also relies upon *People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1178-1179 [36 Cal.Rptr.2d 235, 885 P.2d 1]. That decision observed that it was not disputed whether a juror's apparently inadvertent, innocent receipt of outside information constituted "true juror misconduct." The court therefore assumed that such misconduct occurred. The decision neither analyzes the issue nor cites authority relevant to the question, and cannot be read to support a conclusion that the inadvertent receipt of outside information is not misconduct.

opinion *and render a verdict based on the evidence presented in court." (Irvin
v. Dowd, supra,* 366 U.S. at pp. 722-723 [81 S.Ct. at pp. 1642-1643], italics
added, quoting *Reynolds* v. *United States* (1878) 98 U.S. (8 Otto) 145, 155
[25 L.Ed. 244, 246].) " '[L]ight impressions, which may fairly be presumed
to yield to the testimony that may be offered, which may leave the mind
open to a fair consideration of the testimony, constitute no sufficient objec-
tion to a juror; but . . . those strong and deep impressions which close the
mind against the testimony that may be offered in opposition to them, which
will combat that testimony and resist its force, do constitute a sufficient
objection to him.' " (*Reynolds* v. *United States, supra,* 98 U.S. at p. 155 [25
L.Ed. at p. 246], quoting *United States* v. *Burre* (C.C.D.Va. 1807) 25 F. Cas.
49, 51 (No. 14,692g).) An impartial juror is someone "capable and willing to
decide the case solely on the evidence" presented at trial. (*Smith* v. *Phillips,
supra,* 455 U.S. at p. 217 [102 S.Ct. at p. 946]; *In re Carpenter, supra,* 9
Cal.4th at pp. 648, 656.)

Under California law, if a juror's partiality would have constituted
grounds for a challenge for cause during jury selection, or for discharge
during trial, but the juror's concealment of such a state of mind is not
discovered until after trial and verdict, the juror's actual bias constitutes
misconduct that warrants a new trial under Penal Code section 1181, subdi-
vision 3. (*People* v. *Galloway* (1927) 202 Cal. 81, 89-92 [259 P.332]; *People*
v. *Meza* (1987) 188 Cal.App.3d 1631, 1642-1643 [234 Cal.Rptr. 235].) Thus,
actual bias supporting an attack on the verdict is similar to actual bias
warranting a juror's disqualification. (See *In re Hitchings, supra,* 6 Cal.4th at
p. 120; *People* v. *Galloway, supra,* 202 Cal. at pp. 89-90; *Lombardi* v.
*California St. Ry. Co.* (1899) 124 Cal. 311, 314-317 [57 P. 66].)

Either party may challenge an individual juror for "an actual bias." (Code
Civ. Proc., § 227, subd. (d).) "Actual bias" in this context is defined as "the
existence of a state of mind on the part of the juror in reference to the case,
or to any of the parties, which will prevent the juror from acting with entire
impartiality, and without prejudice to the substantial rights of any party."
(Code Civ. Proc., § 225, subd. (b)(1)(C); *People* v. *Wheeler* (1978) 22 Cal.3d
258, 273-274 [148 Cal.Rptr. 890, 583 P.2d 748].) A sitting juror's actual
bias that would have supported a challenge for cause also renders the juror
unable to perform his or her duties and thus subject to discharge. (*People* v.
*Keenan* (1988) 46 Cal.3d 478, 532 [250 Cal.Rptr. 550, 758 P.2d 1081].)
"Grounds for . . . discharge of a juror may be established by his statements
or conduct, including events which occur during jury deliberations and are
reported by fellow panelists." (*Ibid.*) The term "actual bias" may include a
state of mind resulting from a juror's actually being influenced by extrane-
ous information about a party. (See *Weathers* v. *Kaiser Foundation Hospitals*

(1971) 5 Cal.3d 98, 104 [95 Cal.Rptr. 516, 485 P.2d 1132] ["the same acts of misconduct may frequently be cited both as evidence of concealment of bias and as an objective fact likely to have improperly influenced the jury's verdict"].)

In ruling on defendant's motion for new trial, the trial court determined that Boje's misconduct did not prejudice defendant. ▮ We accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. (*In re Carpenter, supra,* 9 Cal.4th at p. 646; *People* v. *Mickey* (1991) 54 Cal.3d 612, 649 [286 Cal.Rptr. 801, 818 P.2d 84].) Whether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination. (*In re Carpenter, supra,* 9 Cal.4th at pp. 658-659; *In re Hitchings, supra,* 6 Cal.4th at p. 119; *People* v. *Hardy* (1992) 2 Cal.4th 86, 174 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People* v. *Green* (1995) 31 Cal.App.4th 1001, 1017-1018 [38 Cal.Rptr.2d 401]; *English* v. *Lin* (1994) 26 Cal.App.4th 1358, 1364 [31 Cal.Rptr.2d 906]; *Tapia* v. *Barker* (1984) 160 Cal.App.3d 761, 765 [206 Cal.Rptr. 803]; see *People* v. *Mickey, supra,* 54 Cal.3d at p. 649 [appellate court independently reviews mixed questions of law and fact that are predominantly legal].)[5]

▮ Accordingly, pursuant to the standard set forth in *In re Carpenter, supra,* 9 Cal.4th 634, 658-659, this court must independently determine

---

[5]In briefing submitted to the court, the Attorney General relied upon language in *People* v. *Hill* (1992) 3 Cal.App.4th 16, 40 [4 Cal.Rptr.2d 258] to support the contention that we must accord great deference to the trial court's evaluation of the prejudicial effect of misconduct. At oral argument, however, the deputy attorney general stated that upon closer review of *In re Carpenter, supra,* 9 Cal.4th 634, she had modified her position: The determination of prejudice arising from juror misconduct is indeed subject to an appellate court's independent review, but the trial court's credibility determinations and findings on pure questions of fact are reviewed under the more deferential substantial evidence standard.

Although the Attorney General no longer maintains that the Court of Appeal decision in *People* v. *Hill, supra,* 3 Cal.App.4th 16, is controlling on this point, we believe that in order to avoid potential confusion in future cases it is appropriate to consider the validity of this aspect of *Hill.* The opinion in *Hill* cites two other Court of Appeal decisions in support of its deferential standard of review: *Akers* v. *Kelley Company, Inc.* (1985) 173 Cal.App.3d 633, 657 [219 Cal.Rptr. 513], and *Andrews* v. *County of Orange* (1982) 130 Cal.App.3d 944, 954-955 [182 Cal.Rptr. 176]. *Andrews,* the initial decision of this group of Court of Appeal cases, quotes *Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 795-796 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717], which had no occasion to review a trial court's determination of *prejudice,* because substantial evidence supported the trial court's factual finding that no misconduct occurred at all in that case. Moreover, *Andrews* itself goes on to state that in reviewing an order denying a motion for new trial based upon jury misconduct, the reviewing court has a constitutional obligation to determine *independently* whether the misconduct prevented the complaining party from having a fair trial. (*Andrews* v. *County of Orange, supra,* 130 Cal.App.3d at p. 955.) To the extent that *Hill, Akers,* and *Andrews* suggest that appellate courts do *not* conduct an independent review of whether a defendant was prejudiced by juror misconduct, these decisions are contrary to the well-established rule discussed above and are disapproved.

whether, from the nature of Boje's misconduct and all the surrounding circumstances, there is a substantial likelihood Boje was actually biased, i.e., was unable to put aside her impressions or opinions based upon the extrajudicial information she received and to render a verdict based solely upon the evidence received at trial. Further, contrary to the position of the Attorney General, our inquiry in this regard does not reflect any lack of deference to the findings made by the trial court in this case, because that court, in ruling upon the motion for new trial prior to our clarification of the applicable legal standard in *Carpenter*, did not purport to make any finding with regard to whether Boje's misconduct during deliberations, when viewed in light of the totality of the circumstances, indicated that she was actually biased in the sense that she was unable to render a verdict based solely on the evidence received at trial. We look to the entire record to resolve this issue, keeping in mind that the trial court has found the relevant historical facts and resolved the conflicting evidence, but that the question of prejudice is for our independent determination. (*Id.* at p. 659.)[6]

The evidence presented in the trial court established that during the jury's deliberations, when the jury discussed whether defendant's drug use was occasional or repeated and whether defendant truly was concerned for her child's welfare, Boje referred repeatedly to the out-of-court information she had obtained. Boje implied to other jurors that she had information concerning defendant and defendant's family and friends that the other jurors did not have. Although Boje knew she should not discuss matters that were not part of the evidence presented at trial, she intentionally interjected this outside information into the deliberations when she disagreed with the positions of other jurors. In our view, Boje's repeated references to and use of the outside information during deliberations establish a substantial likelihood that her extraneous knowledge concerning defendant caused her to prejudge issues that arose during deliberations and to render a verdict that was not based solely upon the evidence presented in court. As defendant points out, if Boje had not been influenced by what she had learned, she would not have used the information to attempt to convince other jurors that defendant truly was a bad mother and more involved with drugs than the evidence showed.

The Attorney General argues that Boje's comments concerning defendant's drug use could have been based upon the evidence alone. The trial

---

[6]We note that certain factors emphasized by the dissent are irrelevant in properly assessing the likelihood of actual bias pursuant to the standard set forth in *In re Carpenter, supra,* 9 Cal.4th 634. Thus, we do not consider defendant's decision not to seek a change of venue or a sequestered jury, the size of defendant's community, defendant's objections to voluntary manslaughter instructions during the guilt phase of the trial, any perception that defendant obtained a favorable verdict after the guilt phase, or defendant's efforts in seeking a finding of insanity.

court made express findings, however, that the woman in the bar said that defendant used drugs, and that Boje stated to other jurors that defendant used drugs "more than the evidence showed." Such a statement contradicts any notion that Boje's comments were based only upon the evidence presented at trial.

In finding that no prejudice to defendant resulted from Boje's misconduct, the Court of Appeal found it unlikely that Boje actually was influenced by the woman's statements in the bar, because Boje knew she should not discuss such information, the other jurors admonished her, and Boje assumed the woman was drunk. We believe that in reaching this conclusion the Court of Appeal, like the trial court, failed to afford sufficient consideration to the evidence of Boje's conduct during deliberations—conduct that in our view demonstrates that Boje did not disregard the out-of-court information to which she had been exposed, but rather kept that information in mind and was influenced by it in considering the issues that arose during deliberations. Testimony by Boje indicating that the extraneous information played no part in her consideration of the issues is inadmissible, because such testimony attempts to demonstrate the effect of the information upon the juror's subjective reasoning processes. (Evid. Code, § 1150;[7] *Andrews* v. *County of Orange, supra,* 130 Cal.App.3d 944, 958-959.)

The trial court and the Court of Appeal also determined that the likelihood of bias was diminished because the outside information obtained by Boje— relating to defendant's drug use and parental concern—was irrelevant to the issues before the jury at the sanity phase. As is indicated by our discussion of the evidence presented at that phase of the proceedings, however, the questions of defendant's drug use and parental concern played a significant role in the testimony of a number of the expert witnesses with regard to defendant's sanity.

Defendant's protective tendencies toward her children, ostensibly demonstrated primarily by her asserted reluctance to leave them with babysitters because of her fear they would be sexually abused, played a large part in Dr. Trompetter's opinion that defendant could not distinguish between moral right and wrong. The molestation of defendant's son, despite defendant's efforts to protect him, was in Dr. Trompetter's view the most significant

---

[7]Evidence Code section 1150, subdivision (a), provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

traumatic stress for defendant. Thus, the manner in which defendant took care of her children was important in Dr. Trompetter's decision to diagnose defendant as having post-traumatic stress disorder. Moreover, he concluded that the predominant factor that triggered defendant's impulse to kill Driver was her desire to protect W. from further emotional harm.

Similarly, the extent to which defendant had used methamphetamine in the past was important to some of the experts in considering whether that drug could have caused temporary psychosis or delusions on the day of the homicide. Dr. Jones in particular emphasized that he needed to know whether defendant had used methamphetamine regularly over a lengthy period before he could determine whether her blood level suggested that this drug could have rendered her psychotic or delusional. Another prosecution expert found amphetamine intoxication but decided that it did not affect defendant's ability to think rationally. Dr. Trompetter, on the other hand, found that defendant's amphetamine intoxication affected her ability to distinguish right from wrong. All of the defense experts testified that defendant was operating under a delusional system at the time of the homicide.

The foregoing evidence demonstrates that Boje's misconduct was substantially related to important matters raised during trial. The issues being debated by the jury when Boje interjected extrajudicial information were significant to the jury's evaluation of expert opinions about whether defendant was sane at the time she committed the offense. Boje disclosed the damaging information concerning defendant, which contradicted other evidence presented at the trial, precisely when the jury was debating the merits of these conflicting expert opinions. For example, Juror Hazelwood testified that Boje said she could tell that defendant was a "crankster"—at a time when the jury was trying to decide whether defendant had used drugs only on the day of the hearing, "like they tried to show through testimony, or whether this was built up in her system over a long period of time, which [Dr.] Jones tried to show . . . ." Juror Cooper stated that Boje made her comments regarding defendant's babysitter when the jury was arguing about the importance to defendant of her role as a mother. As explained, the protective role defendant assumed toward W. was critical to Dr. Trompetter's assessment of her mental state at the time of the killing. Boje's repeated, improper use of the damaging information concerning defendant leads us to conclude that there is a substantial likelihood Boje was influenced to defendant's detriment by the information she had received outside of court and, therefore, that she was actually biased.[8]

Our conclusion that the record establishes Boje was likely to have been actually biased in this regard is supported by recent decisions of this court.

---

[8]Contrary to the dissent's implication that the individual jurors' testimony we describe is disputed and inconsistent with the trial court's findings, this evidence is contradicted only by

*In re Hitchings, supra,* 6 Cal.4th 97, involved a juror who lied in her jury questionnaire and on voir dire concerning the scope of her pretrial knowledge of the case. She also violated her oath as a juror and the trial court's admonitions by discussing the case with nonjurors before the trial was over, and she lied at evidentiary hearings about the scope of her pretrial knowledge of the case and her discussions with nonjurors. (*Id.* at p. 118.) A referee concluded that the juror's statement to a nonjuror that the defendant should be horribly mutilated for his crimes was nothing more than an impression about the evidence. (*Id.* at pp. 120-121.) We disagreed and determined that the statements indicated that the juror had prejudged the case; therefore, it necessarily followed that the respondent had not rebutted the presumption of prejudice arising both from the juror's concealment of information on voir dire and from the violation of her oath by speaking to a nonjuror. (*Id.* at p. 121-122.)

Unlike *In re Hitchings,* this case does not involve a finding that the juror lied during voir dire. Boje's other misconduct, however, was at least as serious as that of the juror in *Hitchings,* who discussed the case with a *non*juror during trial. Boje both obtained information about the case from a nonjuror and revealed it to other *jurors* during deliberations when she disagreed with them. Like the juror in *Hitchings,* Boje violated her oath and the trial court's instructions, and the trial court's factual findings establish that she repeatedly lied during the evidentiary hearing about the extent of her misconduct. " 'When a person violates [her] oath as a juror, doubt is cast on that person's ability to otherwise perform [her] duties.' " (*In re Hitchings, supra,* 6 Cal.4th at p. 120.) As in *Hitchings,* we find that Boje's misconduct and the surrounding circumstances reveal a substantial likelihood that she rendered a verdict based, at least in part, upon information obtained outside of court.

*In re Carpenter, supra,* 9 Cal.4th 634, also is instructive. That case considered whether a juror was biased after she learned during trial that the defendant previously had been convicted and sentenced to death in a related case. The juror failed to report what she had learned to the court and told nonjurors about it. In finding no substantial likelihood that the juror was biased, we emphasized several factors, including the following: (1) the juror's failure to report her knowledge was only "passive" misconduct;

---

testimony from Boje that was rejected by the trial court. Moreover, the individual jurors' testimony is the *only* evidence supporting the trial court's express finding that Boje disclosed outside information at points in the deliberations when she disagreed with the views of other jurors. The absence of express trial court findings with regard to the testimony of each individual juror does not preclude our consideration of that testimony when we examine the entire record to ascertain the nature of Boje's misconduct. (*In re Carpenter, supra,* 9 Cal.4th at p. 654.)

(2) telling nonjurors about what she knew could not itself have prejudiced the defendant; (3) the juror did not suggest to the nonjurors that she would consider the extraneous information in reaching her verdict; and (4) the evidence did not indicate "that the juror told any fellow jurors, as distinct from *nonjurors*, what she had learned." (*Id.* at pp. 656-657, original italics.) Our opinion stressed that nothing about the juror's conduct indicated that she had "failed to base her verdict solely on the evidence." (*Id.* at p. 656.)

Boje, in contrast, disclosed to other jurors what she knew. As *In re Carpenter* explains, "[a]ctually *using* the forbidden information—rather than basing the verdict on the evidence—is quite different" from revealing it to nonjurors. (*In re Carpenter, supra,* 9 Cal.4th at p. 656, original italics.) A juror's disclosure of extraneous information to other jurors tends to demonstrate that the juror intended the forbidden information to influence the verdict and strengthens the likelihood of bias. (*Id.* at p. 657.) Boje used the prejudicial information that she obtained about defendant in arguing with the other jurors about issues involving evidence presented at trial that conflicted with Boje's information. (See also *Weathers* v. *Kaiser Foundation Hospitals, supra,* 5 Cal.3d 98, 110 [conduct showing actual bias included juror's repeated comments that defendant was such a good hospital that it should not be found liable].)

Thus, Boje's interjection of extraneous evidence into the deliberations suggests that, in deciding the questions presented at the sanity phase, she was unable to put aside both the information she had acquired outside of court and her impressions and opinions derived from that information, thus indicating a substantial likelihood of actual bias on her part. Court of Appeal decisions have ordered new trials or discharged jurors for similar misconduct. For example, in *Andrews* v. *County of Orange, supra,* 130 Cal.App.3d 944, during deliberations one juror reported extrajudicial information he had received from a real estate broker concerning disputed issues at trial. The juror continued to discuss this extraneous evidence despite requests from other jurors that he desist. The Court of Appeal found that disclosure of this information was misconduct. When considered together with his comment during trial that the case was a "big farce" and his refusal at times to participate in deliberations, the juror's misconduct indicated his prejudgment of the case as well as possible concealment of bias, thus requiring a new trial. (*Id.* at pp. 957-960.)

Similarly, in *Province* v. *Center for Women's Health & Family Birth* (1993) 20 Cal.App.4th 1673 [25 Cal.Rptr.2d 667], one juror told another during trial that he believed the trial was a waste of time and the decision was clearcut, and he began discussing a newspaper article about the case.

He also spoke about the newspaper article during deliberations. The appellate court held that the juror's misconduct indicated that he had made up his mind to vote for the defense before the plaintiff had finished presenting evidence during the trial. (*Id.* at pp. 1678-1680.)

*People* v. *Thomas* (1990) 218 Cal.App.3d 1477 [267 Cal.Rptr. 865] involved analogous misconduct. During deliberations one juror announced that she could not accept the testimony of a police officer, because she firmly believed, based upon personal experience, that police officers in her area generally lie. She then rejected the jury's attempt to consider the issue. When the trial court was informed of the juror's conduct, it discharged her. (*Id.* at p. 1482.) The Court of Appeal upheld the trial court's determination, finding that the juror "obviously had prejudged the credibility of the police officers who testified at trial and was unable to cast aside her personal bias in weighing the evidence." (*Id.* at p. 1485.)

In *People* ex rel. *Dept. Pub. Wks.* v. *Curtis* (1967) 255 Cal.App.2d 378 [63 Cal.Rptr. 138], an eminent domain case, one juror failed to disclose during voir dire that he was taking a course in real estate appraisal. In the course of deliberations, some jurors felt that they should disregard the valuation testimony of the state's experts because, these jurors believed, the experts had an incentive to make a low appraisal. Based upon information he learned in his real estate class, the juror in question told the jury that, to the contrary, the state's experts were highly qualified but the defendant's expert was not. (*Id.* at pp. 386-388.) The appellate court concluded that the juror's misconduct indicated bias warranting a new trial. "The fact that he had such bias is indicated from the statement he admittedly made in the jury room concerning the relative qualifications of [the experts]. Had he revealed his state of mind he might have been excused. The jury would not then have had upon it one member whose vote made the verdict possible and *who had been influenced by and sought to influence the other jurors by information received out of court.* [¶] [He] admittedly told the jury that he understood from his appraisal course that the qualifications of . . . one of the state's appraisers[] were very high. He made that statement when he learned that some jurors felt that the jury should disregard the opinions of the state's appraisers altogether on the ground that they were biased in favor of the state. At that point, *it was the duty of the jurors to evaluate the testimony of the expert witnesses solely from evidence adduced at the trial.*" (*Id.* at p. 391, italics added.) The Court of Appeal held that the juror's misconduct was prejudicial and that the trial court erred in denying the defendant's motion for trial. (*Id.* at pp. 391-392.)

As in the foregoing cases, Boje during deliberations made reference to extrajudicial evidence despite admonitions from other jurors not to do so.

When Boje did participate in jury deliberations regarding defendant's qualities as a mother and her drug use, Boje emphasized the extrajudicial information she had obtained, attempting to change the views of other jurors in light of that information. Like the juror in *People* ex rel. *Dept. Pub. Wks.* v. *Curtis, supra,* 255 Cal.App.2d 378, Boje used her personal knowledge in an attempt to persuade the jury to disregard the opinions of defendant's experts. The circumstance that she obtained the extraneous information during trial, rather than before, is irrelevant to a determination whether it influenced her consideration of issues raised during the sanity phase of the trial. Boje's misconduct indicates "a state of mind . . . in reference to the case, or to [one] of the parties," that prevented her "from acting with entire impartiality, and without prejudice to the substantial rights of [that] party." (Code Civ. Proc., § 225, subd. (b)(1)(C).) Our review of Boje's conduct in light of the entire record convinces us that she was unable to put aside the impressions and opinions formed from her consideration of the extraneous information, and to decide the matter based solely upon the evidence presented at trial. (*Reynolds* v. *United States, supra,* 98 U.S. at p. 155 [25 L.Ed. at p. 246]; *Smith* v. *Phillips, supra,* 455 U.S. at p. 217 [102 S.Ct. at p. 946]; *In re Carpenter, supra,* 9 Cal.4th at pp. 648, 656.)

Because Boje's misconduct during the sanity phase evidences a state of mind that rendered her unable to perform her duty not to prejudge the case and to render a decision based solely upon the evidence presented to the jury, we cannot sustain the Court of Appeal's determination that Boje was impartial. We find a substantial likelihood that Boje was actually biased. Therefore, the presumption of prejudice arising from her misconduct remains unrebutted. (*In re Hitchings, supra,* 6 Cal.4th at pp. 118-123.)

Boje's misconduct occurred during the sanity phase of the trial; therefore, the resulting prejudice to defendant is limited to the sanity verdict, absent evidence to the contrary. As noted, the trial court ruled that Boje did not conceal any bias during voir dire, and defendant does not challenge that determination here. Defendant does argue, however, that substantial evidence does not support the trial court's finding that Boje's sole source of extraneous information concerning defendant was the woman in the bar. Thus, for example, if Boje had acquired extraneous information from another person before or during the guilt phase of the trial, the presumption of prejudice would extend to the guilty verdict.

As noted, an appellate court will accept the trial court's credibility determinations and findings on questions of historical fact if they are supported by substantial evidence. (*In re Carpenter, supra,* 9 Cal.4th at p. 646; *People* v. *Mickey, supra,* 54 Cal.3d at p. 649.) The trial court credited Boje's

testimony that the woman in the bar was the only source of Boje's out-of-court information concerning defendant; the court expressly found that she received no information about defendant or the case from any other source. Boje's testimony provides substantial evidence supporting the trial court's finding. The trial court's determination that Boje was not credible in her testimony concerning other matters did not, as defendant contends, preclude that court from finding that Boje testified truthfully concerning the source of her information—particularly where there is no evidence in the record suggesting any other source.[9] Defendant's bare speculation that "a far more likely source" was a potential prosecution witness who did not testify finds no support in the record.

In sum, after independently reviewing the issue whether defendant was prejudiced by juror misconduct, we conclude that the lower courts erred in determining that the presumption of prejudice arising from the juror misconduct was rebutted, but we also conclude that the juror misconduct tainted only the verdict at the sanity phase.

## III

Because defendant was deprived of her right to a unanimous verdict of 12 impartial jurors at the sanity phase of the trial, the trial court erred in denying defendant's motion for new trial on the issue of sanity. (Pen. Code, § 1181, subds. 2 and 3; *People* v. *Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91]; *People* v. *McCowan* (1986) 182 Cal.App.3d 1, 19-20 [227 Cal.Rptr. 23].)

The judgment of the Court of Appeal is reversed insofar as it affirms the verdict rendered at the sanity phase of the proceedings, and the case is remanded to the Court of Appeal with directions to remand the matter to the superior court for a new trial limited to the issue of defendant's sanity at the time she committed the offense.

Kennard, J., and Werdegar, J., concurred.

---

[9]Defendant contends that substantial evidence does not support the trial court's finding regarding the source of Boje's information, because certain matters Boje allegedly disclosed during deliberations could not have come from the woman in the bar. For example, defendant notes Juror Cooper declared that Boje told other jurors she knew defendant's drug dealer, and defendant argues that such knowledge necessarily came from some other source. As defendant emphasized at oral argument, however, the trial court's findings summarized the general type of information Boje overheard in the bar and disclosed during deliberations. The trial court did not purport to decide whether Boje did or did not make each and every statement attributed to her by Juror Cooper and other jurors.

**MOSK, J.—** ██ ██ I concur in the judgment.

Like the author of the lead opinion, I am of the view that Juror Katherine Elizabeth Boje committed prejudicial misconduct bearing on the question of sanity. My reasons are as follows.

In *In re Carpenter* (1995) 9 Cal.4th 634 [38 Cal.Rptr.2d 665, 889 P.2d 985], the majority recognized, under *In re Hitchings* (1993) 6 Cal.4th 97 [24 Cal.Rptr.2d 74, 860 P.2d 466] and *People* v. *Holloway* (1990) 50 Cal.3d 1098 [269 Cal.Rptr. 530, 790 P.2d 1327], that it is misconduct "for a juror to receive information outside of court about the pending case . . . ." (*In re Carpenter*, *supra*, 9 Cal.4th at p. 647.)

The *Carpenter* majority also recognized, under decisions including *Holloway* and *People* v. *Marshall* (1990) 50 Cal.3d 907 [269 Cal.Rptr. 269, 790 P.2d 676], that juror misconduct "gives rise to a presumption of prejudice . . . ." (*In re Carpenter*, *supra*, 9 Cal.4th at p. 651; see *id.* at p. 650.) That means, of course, that "unless the prosecution rebuts that presumption . . . , the defendant is entitled to a new trial." (*People* v. *Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91]; accord, e.g., *People* v. *Marshall*, *supra*, 50 Cal.3d at p. 949; *People* v. *Miranda* (1987) 44 Cal.3d 57, 117 [241 Cal.Rptr. 594, 744 P.2d 1127]; *In re Stankewitz* (1985) 40 Cal.3d 391, 402 [220 Cal.Rptr. 382, 708 P.2d 1260]; see *People* v. *Holloway*, *supra*, 50 Cal.3d at p. 1108.)

But, without mentioning the presumption of prejudice, the *Carpenter* majority went on to "summarize" the law relating to the determination of prejudice, as follows: "[W]hen [juror] misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial. The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant." (*In re Carpenter*, *supra*, 9 Cal.4th at p. 653.)

When it is read literally and in the abstract, the *Carpenter* majority's "summary" is problematical. The statement that "[t]he verdict will be set aside *only if* there appears a substantial likelihood of juror bias" (*In re Carpenter*, *supra*, 9 Cal.4th at p. 653, italics added) seems to imply that the verdict will *not* be set aside if the reviewing court cannot determine whether

or not there is, in fact, a substantial likelihood of such bias. An implication of this sort, which shifts the risk of nonpersuasion from the People to the defendant, amounts to a presumption of *non*prejudice. In his dissenting opinion in *People* v. *Von Villas* (1995) 36 Cal.App.4th 1425, 1455 [43 Cal.Rptr.2d 233], Justice Woods wrote: "The summary is more than inaccurate, it is irreconcilable with *Marshall*, *Holloway*, and *Hitchings*. These three cases hold, as do a legion of earlier ones, that juror misconduct, such as the receipt of extraneous information, raises a *presumption* of prejudice. Quite apart from and prior to any 'review of the entire record' the misconduct itself raises a presumption of prejudice which requires a reversal unless rebutted. This fundamental principle is omitted from [the] summary." (Original italics.)

But when it is read reasonably and in context, the *Carpenter* majority's "summary" is sound. Considered together with the presumption of prejudice, it may be understood thus: "When juror misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record. The verdict will be set aside unless there appears no substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias unless the extraneous material, judged objectively, is not inherently and substantially likely to have influenced the juror. Second, looking to the nature of the misconduct and the surrounding circumstances, we will also find bias unless it is not substantially likely the juror was actually biased against the defendant." (Cf. *In re Carpenter*, *supra*, 9 Cal.4th at p. 653 [source of the recast language].)

Turning to the present matter, I believe that Juror Boje committed misconduct bearing on the question of sanity. The facts compel this conclusion. Although Boje's initial exposure to the woman who spoke about defendant in the bar was innocent and passive,[1] her subsequent decision to remain there for half an hour, her failure to disclose the incident to the court, and her use of what she heard there during deliberations with the other jurors on sanity, cannot be so characterized. I also believe that Boje's misconduct gives rise to a presumption of prejudice. The law compels this conclusion. All the decisions cited above are in accord. Nevertheless, I cannot determine whether or not there is, in fact, a substantial likelihood of bias. Defendant claims "actual" and not "inherent" bias. One can reasonably conclude *either* that Boje was "actually" biased by what she heard *or* that she was not,

---

[1] And unsurprising. In his dissenting opinion, Justice Baxter proves the point. All the events that are pertinent here—which were notorious throughout the state—took place in rural Tuolumne County, with a population of only 53,100: defendant killed the victim in Jamestown, a small and unincorporated community; and she was tried in Sonora, the county seat and largest town, which is about 10 miles away, with a population of only 4,390. (Dis. opn. of Baxter, J., *post*, at p. 593, fn. 1.)

depending on whether one infers *either* that she was herself influenced *or* that she was simply attempting to influence others. With matters thus in equipoise, the presumption of prejudice stands unrebutted. Defendant is therefore entitled to a new trial on the question of sanity.

BAXTER, J.—I respectfully dissent. In 1988 or 1989, defendant's young son told her the victim, Daniel Driver, had molested him. Driver remained at large until 1993, while defendant's son developed serious psychological problems as a result of the sexual assault. Defendant's long-smoldering anger was rekindled when Driver, finally arriving in court to face molestation charges, smirked at defendant and her son. She lunged at Driver, but her sister held her back. Later, during a break in the court hearing, defendant exacted her final revenge. Using a pistol she had taken from her sister's purse, she fired five shots into the back of Driver's head at point-blank range and in full public view.

In an emotional but lucid statement to the police, defendant expressed moral *ambivalence* about her act. She said Driver was "sick" and deserved to die for the pain he had caused, but she also declared she had not planned to kill, wondered aloud if her act meant she herself was "sick," and claimed she had told her son she belonged in jail because what she had done was wrong. Defendant also admitted using "crank" (i.e., methamphetamine) on the morning of the homicide, but she said she did not use it all the time. A blood test showed methamphetamine levels consistent with substantial use over several days.

Charged with a sensational murder in a rural community, defendant requested no change of venue. Her choice was calculated to exploit the considerable local sympathy for her situation. On the other hand, a hometown trial entailed the strong chance that jurors would hear gossip about the case and about defendant herself.[1]

Nonetheless, defendant's preference for a local trial bore fruit. Despite overwhelming evidence that she had carried out a "vigilante" execution, the

---

[1]The homicide occurred in April 1993 in Jamestown, a small, unincorporated Tuolumne County community where the preliminary hearing on the molestation charges against Driver was being held. On July 1, 1994, the population of Tuolumne County as a whole was only about 53,100. (Cal. Dept. of Finance, Cal. Statistical Abstract (Nov. 1995) p. 13.) Defendant's trial took place in late 1993 in Sonora, the county seat of Tuolumne County and its largest town. On January 1, 1994, the population of Sonora, which is less than 10 miles from Jamestown, was approximately 4,390. (*Id.* at p. 14.) Despite the likelihood of local gossip, rumor, and discussion of the case within this close-knit community, the record discloses no effort by defendant to sequester the jury at either the guilt or sanity trials.

jury acquitted her of murder and convicted her only of voluntary manslaughter, apparently under instructions presenting the theory of "heat of passion" negating malice.[2]

Not content, defendant sought a further finding of not guilty by reason of insanity. In a separate trial, various expert witnesses debated at length defendant's mental state at the time of the homicide. Though there was a consensus that defendant had a grandiose, emotional, narcissistic, impulsive, and aggressive personality, prosecution experts uniformly concluded she exhibited no mental condition that would have prevented her from knowing her act was wrong.

One defense expert, Dr. Philip Trompetter, suggested in the course of his extensive testimony that defendant had a hypervigilant attitude toward her children, as illustrated by the fact that she usually refused to employ babysitters. Dr. Trompetter also said defendant reported using methamphetamine "15 or 20 times" in the year before the homicide, and Dr. Trompetter himself had received information about defendant's use of drugs in 1989.

In Dr. Trompetter's opinion, defendant's degree of use would influence the extent to which the drug might have impaired her mental condition at the time she killed the victim. A prosecution psychopharmacologist testified that defendant's behavior on the day of the homicide seemed less influenced by her blood-amphetamine level than he would expect in an inexperienced user. With the exception of Dr. Trompetter, no expert witness attached significant importance to drugs as a factor in defendant's mental condition when she killed the victim. In a verdict which found ample support in the evidence, the jury unanimously found that defendant was sane at the time of the homicide.

Later it came to light that during the sanity trial, Juror Katherine Elizabeth Boje, while passing time in a local bar, had overheard some unfavorable

---

[2]The irony in defendant's current claims of juror taint is heightened by record indications that she and her counsel sought to take maximum advantage of her ties to the local community. Indeed, the record strongly suggests her strategists sought to gamble on a complete acquittal, against the evidence and instructions, through the "nullification" powers of a sympathetic local jury. At the outset, the *prosecution* felt compelled to take the unusual step of obtaining an antipublicity order to prevent pollution of the jury pool *by the defense*. Moreover, the trial court was obliged to overrule vigorous *defense objections* to its sua sponte instruction on voluntary manslaughter, based on heat of passion, as a lesser included offense of murder. As counsel candidly explained in the words of an old song, the defense took the tactical view that the case should be tried on the basis of "all or nothing at all." On appeal, defendant persisted in her objection to the heat of passion instruction, urging that the evidence *did not support* this theory because she had enough time to "cool down" after the victim's most recent provocation. Thus, even prior to the sanity phase, the defense sought to put the jury to a difficult choice: either convict a neighbor of the most serious form of criminal homicide—murder—for killing her child's molester, or absolve her of all criminal liability.

comments about defendant by a woman who claimed to know her. Boje did not report the incident to the trial court, but several times during the jury's sanity phase deliberations, she interjected the information she had overheard.

The trial court conducted a careful investigation, took evidence, made detailed findings of fact, and determined that while Boje had committed "misconduct," no prejudice warranting a new trial had resulted. After further careful analysis, the Court of Appeal agreed. However, the instant lead and concurring opinions hold otherwise. Because they conclude we must find a substantial likelihood of juror bias arising from this incident, they overturn the trial court's denial of defendant's motion for a new sanity trial. I cannot agree.

Both the lead opinion and the concurrence purport to apply principles we recently articulated in *In re Carpenter* (1995) 9 Cal.4th 634 [38 Cal.Rptr.2d 665, 889 P.2d 985] (*Carpenter*). There we held that when a verdict already rendered is challenged because one or more jurors received information from outside sources, the judgment must be reversed if, but only if, there appears a substantial likelihood of juror bias. (*Id.* at p. 653.)

Under *Carpenter*, such bias is either "inherent" or "actual." "Inherent" bias must be found if the outside information was significant enough that its improper introduction in the trial itself would have required reversal by normal appellate standards of "prejudicial error." (*Carpenter, supra,* 9 Cal.4th at pp. 653-654.) Even when no inference of "inherent" bias thus arises, reversal is still necessary if the "totality of the circumstances" indicate an objective likelihood that one or more jurors was "actually" biased by the information. (*Id.* at p. 654.)

For purposes pertinent here, the trial court, after resolving credibility issues, made the following findings of chronological fact: Juror Boje had no pretrial bias or prejudice which she concealed during voir dire. However, while Boje was in a bar during the sanity trial, she overheard another woman, whom she did not know, claim to have been a babysitter for defendant's children. The woman stated that defendant left her children for long periods, was not a good mother, and used drugs.

The trial court further found as follows: During subsequent sanity deliberations, Boje told fellow jurors she herself knew defendant's babysitter. Boje also implied she had information about defendant, her family, and her associates, that other jurors did not have. In the course of deliberations, Boje referred to defendant as a "crankster" who used methamphetamine more than the evidence showed. Boje made these comments, either out loud or under

her breath, at times when she disagreed with views expressed by other panelists.[3]

Defendant does not press in this court any claim that Boje harbored or concealed any *pretrial* bias. The sole issue is therefore the effect of the outside information to which Boje was exposed during the sanity trial. Moreover, defendant does not contend this information was significant enough to produce "inherent" bias in any juror, and the lead and concurring opinions wisely place no reliance on any such theory. Finally, neither defendant, the lead opinion, nor the concurrence suggests that any juror other than Boje was "actually" biased by exposure to the information. Instead, the lead and concurring opinions rely solely on their acceptance of defendant's argument that Boje herself must be considered "actually" biased as a result of the information she received.

The lead opinion focuses almost exclusively, and the concurrence primarily, on Boje's behavior during the deliberations themselves. The salient fact emphasized is that Boje mentioned the outside information on a number of occasions when she disagreed with other jurors' views. The lead opinion's reasoning on the point is particularly simplistic. That reasoning starts and stops with the premise that if Boje had not been influenced by what she overheard, she would not have attempted to use it as a basis for swaying other jurors.

But in order to assess, in a post-trial context, whether it is "substantial-[ly]" likely a juror became "actually" biased by receiving outside information that could not have produced "inherent" bias, we must examine "the '*entire record*' logically bearing on [such a] finding . . . ." (*Carpenter, supra*, 9 Cal.4th at p. 654, italics added.) The pertinent "record" includes not only "the nature of the juror's conduct [in relation to the extraneous information]," but also "the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant." (*Ibid.*)

Moreover, the examination must be practical and not hypertechnical, conducted with the understanding that "[j]urors are not automatons[, but] are

---

[3]To support their conclusions, the lead opinion presents a richer and more lurid version of the events involving Juror Boje. In doing so, however, they violate their own purported deference to the trial court's credibility determinations and findings of historical fact. The lead opinion improperly resolves, in the manner most favorable to their conclusions, disputed factual nuances that were not addressed or determined by the trial court. For example, the lead opinion relies solely on the disputed testimony of individual jurors to state as "fact" that Boje's comments came at specific moments when the jurors were discussing trial evidence about defendant's maternal attitudes and drug use, that Boje was warned by other jurors not to discuss information from extraneous sources, and that Boje herself acknowledged she was wrong to do so. The trial court never made any such findings. I cannot support the lead opinion's attempt to recast and reweigh the evidence.

imbued with human frailties" which inhere in the jury system. (*Carpenter*, *supra*, 9 Cal.4th at pp. 654-655.) "If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias. To demand theoretical perfection from every juror during the course of trial is unrealistic" (*id.* at p. 655), and few verdicts would survive scrutiny under such a standard (see *People* v. *Marshall* (1990) 50 Cal.3d 907, 950 [269 Cal.Rptr. 269, 790 P.2d 676]). "[T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection." (*Carpenter*, *supra*, 9 Cal.4th at p. 654.)

With these principles in mind, and after considering Juror Boje's conduct in the context of the "entire record," I conclude that the motion for a new trial was properly denied. In my view, the record fails to show an objective and "substantial" likelihood that the information Boje overheard actually influenced this juror's vote or affected her ability and intention to decide the issue of defendant's sanity solely on the evidence, as she had sworn to do.

First, the circumstances under which Boje was exposed to the outside information belie any "substantial" probability of "actual" bias. Boje herself engaged in no outside conversation about the case contrary to admonition. Instead, she simply overheard snippets of information in a bar. (Cf. *Carpenter*, *supra*, 9 Cal.4th at p. 656 [juror's initiation of conversation with friends about information she wrongly learned from newspapers creates no necessary inference of bias].) Boje's exposure to this information occurred while she was pursuing a normal activity permitted an unsequestered juror, in a small community where rumors and gossip about defendant's high-profile case were certain to be in widespread circulation.

Even if Boje's *inadvertent* receipt of outside information may technically be deemed "misconduct," any strong inference of bias is dispelled by the "passive" nature of the impropriety. (*Carpenter*, *supra*, 9 Cal.4th at p. 656.) Moreover, the fact that the information came from a stranger overheard in a bar undermines any objective deduction that Boje gave the information serious independent credence.

Boje also committed "misconduct" by failing to report her exposure to the trial court. However, as we indicated in *Carpenter*, a juror's improper failure to make such a report is not a substantial indicator that she was biased by the outside information. Failure to report is also a "passive" form of misconduct, and it is understandable in human terms. "Many jurors, in the middle of a long and notorious trial, might, for many reasons unrelated to bias, be reluctant to go forward and actively inject themselves into the proceedings." (*Carpenter*, *supra*, 9 Cal.4th at p. 656.)

Moreover, though the lead opinion implies otherwise, when the information Boje overheard is viewed against the entire record, there appears no objective likelihood, "substantial" in degree, that she was swayed from exclusive reliance on the trial evidence. The snippets of gossip Boje overheard in one casual barroom conversation hardly compared with the wealth of evidence introduced in the guilt and sanity trials themselves about the circumstances of defendant's crime, her background, her lifestyle, her parental feelings, and her mental state in general. Indeed, as both courts below emphasized, the gossip about defendant's drug use substantially coincided with evidence on that issue that was introduced at the sanity phase, largely at defendant's behest. The bar patron's assertion that defendant "was not a good mother" and left her children for long periods did tend to contradict one aspect of Dr. Trompetter's sanity phase analysis of defendant's personality. However, as the trial court indicated, this was a "remote" issue in the overall presentations of the sanity phase experts from both sides.

It is true that Boje improperly mentioned the outside information on several occasions during deliberations. (See *Carpenter, supra,* 9 Cal.4th at p. 656 [willingness to "*us*[e] the forbidden information" as bearing on bias].) However, that circumstance alone is not dispositive on the issue of "actual" bias. If it were, the interjection of outside information into deliberations would always require invalidation of the jury's verdict. Obviously this cannot be, and is not, the law. (See, e.g., *People* v. *Marshall, supra,* 50 Cal.3d 907, 949-952.)

Here, there is no finding that Juror Boje said *she* would allow the outside information to influence her own verdict. (See *Carpenter, supra,* 9 Cal.4th at p. 656.)[4] And since all other aspects of the "entire record" make it appear so objectively *unlikely* that Boje was swayed by the gossip she overheard, the most plausible inference is that any adverse attitudes she came to harbor toward defendant's claim of insanity must, like those of the other 11 jurors, have arisen *from the evidence produced at the guilt and sanity trials.* Even if she sought to influence *other* jurors with what she had heard outside the courtroom, or simply used this means to express her frustration with the

---

[4]The trial court found Juror Boje commented that defendant used drugs "more than the evidence showed," but given the tangential relevance of such information, and the fact that if anything, it tended to support, rather than undermine, the defense theory of insanity, this comment indicates no objective likelihood of adverse bias. According to the testimony of Juror Ulvevadet, Boje said that "if we knew what she knew then we would know different." But the trial court did not specifically credit this portion of Ulvevadet's testimony. I therefore conclude it can form no basis for a conclusion that Boje was "actually" biased. More fundamentally, any such comment by Boje is inadmissible to demonstrate her bias, since it involves a direct intrusion into her internal deliberative processes. (Evid. Code, § 1150, subd. (a).)

progress of deliberations, her behavior does not establish her own "actual" bias arising from the outside information.[5]

The lead and concurring opinions reflect the very "quest [for] an ever-elusive perfection" we so recently condemned in *Carpenter, supra,* 9 Cal.4th at page 654. Moreover, they do so in a case where such a quest is particularly inappropriate. When defendant accepted a jury of her neighbors, including Juror Boje, she entrusted her fate not to "automatons," but to human beings and their frailties, with all the benefits and burdens that choice entailed. In the highly charged local atmosphere this case produced, it would have been almost impossible to protect defendant's unsequestered jury from any and all exposure to outside rumor, gossip, and discussion. That Juror Boje was so exposed, without any effort on her part, is unremarkable in the extreme. That she spoke of what she heard in the jury room is unfortunate, but short of a showing of "actual" bias, it was a human mistake of the kind we must be prepared to accept as the price of our precious jury system. I find no "substantial" likelihood that such "actual" bias occurred here. I would affirm the judgment of the Court of Appeal.

Chin, J., and Brown, J., concurred.

---

[5]The concurring opinion concedes, at least, that Boje's conduct does not compel an inference of "actual" bias and, indeed, permits no clear conclusion on that question. However, the concurrence reasons, because the issue is in "equipoise" on the evidence, the "presumption of prejudice" traditionally applicable to prior misconduct "stands unrebutted." (Conc. opn., *ante,* at p. 593.) I disagree. The "presumption of prejudice" may be rebutted by the reviewing court's determination, after it has reviewed the "entire record," that there is no "reasonable probability" or "substantial likelihood" of actual bias. (*Carpenter, supra,* 9 Cal.4th 634, 653; *In re Hitchings* (1993) 6 Cal.4th 97, 119 [24 Cal.Rptr.2d 74, 860 P.2d 466]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 117 [241 Cal.Rptr. 594, 744 P.2d 1127]; *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 417 [185 Cal.Rptr. 654, 650 P.2d 1171].) For the reasons expressed elsewhere in this opinion, I conclude the "entire record" in this case raises no such "reasonable probability" or "substantial likelihood."