CORRIGAN, J., Concurring and Dissenting.
The movie American Me[1] stars Edward James Olmos as a young man who is incarcerated and joins a prison gang, which he leads in a violent struggle over drug turf. It is a raw, violent depiction of the American prison system, with multiple scenes of stabbing and sexual assault.
It is this movie that two undecided jurors watched during a break in deliberations, at the urging of the jury foreman and other jurors voting for the death penalty. There is no dispute that these two jurors committed misconduct by actively seeking out information not presented at trial. There is no dispute that the jury did not reach a verdict after a full day of deliberations. The next day, after these two jurors watched the film, the jury deliberated for only 30 minutes before returning a death verdict. In light of this chronology, I disagree with the majority’s conclusion that the presumption of prejudice arising from the jurors’ misconduct has been rebutted. The record as a whole demonstrates a substantial likelihood these two jurors were actually biased in that they were influenced to impose the death penalty based on external information they intentionally acquired in violation of their oath.
The misconduct must be considered in context. The prosecutor argued against life without the possibility of parole because defendant could join a prison gang and kill again while incarcerated. In urging undecided Jurors McClaren and Rennie to watch American Me, Foreman Ary took up the prosecutor’s theme. He explained at the evidentiary hearing: “The two jurors, which [were] the two young ladies, they were so naive about street life until they were so determined that he couldn’t harm no one while he was in prison for the rest of his life, and we discussed this, we deliberated and discussed it... . We have to do something about this because it’s been deliberated too long, so I asked these two young ladies, . . . but these two said he will never hurt anyone as long as he is in the penitentiary for life, [f] I said you just don’t know anything about prison life. I said you two go to Blockbuster and *899 get the movie ‘American Me.’ Sit down and look at it. It will explain penitentiary life to you, and you will see what a person can do while he is in the penitentiary.” Ary told them the movie was based on a true story.
“When juror misconduct involves the receipt of information about a party or the case from extraneous sources, the verdict will be set aside only if there appears a substantial likelihood of juror bias. [Citation.] Such bias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not ‘inherently’ prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was ‘actually biased’ against the defendant. If we find a substantial likelihood that a juror was actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict, because a biased adjudicator is one of the few structural trial defects that compel reversal without application of a harmless error standard.” (People v. Nesler (1997) 16 Cal.4th 561, 578-579 [66 Cal.Rptr.2d 454, 941 P.2d 87] (Nesler); see In re Carpenter (1995) 9 Cal.4th 634, 653 [38 Cal.Rptr.2d 665, 889 P.2d 985].)
“Actual bias” in this context does not mean that a juror must dislike the defendant or harbor a desire to treat him unfairly. Rather, “[t]he Sixth Amendment right to an impartial jury and the due process right to a fundamentally fair trial guarantee to criminal defendants a trial in which jurors set aside preconceptions, disregard extrajudicial influences, and decide guilt or innocence ‘based on the evidence presented in court.’ [Citations.]” (Skilling v. United States (2010) 561 U.S. 358, 438 [177 L.Ed.2d 619, 130 S.Ct. 2896, 2948]; see Irvin v. Dowd (1961) 366 U.S. 717, 723 [6 L.Ed.2d 751, 81 S.Ct. 1639]; People v. Leonard (2007) 40 Cal.4th 1370, 1414 [58 Cal.Rptr.3d 368, 157 P.3d 973].) “An impartial juror is someone ‘capable and willing to decide the case solely on the evidence’ presented at trial,” and “[t]he term ‘actual bias’ may include a state of mind resulting from a juror’s actually being influenced by extraneous information about a party.” (Nesler, supra, 16 Cal.4th at p. 581.) “Juror misconduct involving the receipt of extraneous information about a party or the case that was not part of the evidence received at trial creates a presumption that the defendant was prejudiced by the evidence and may establish juror bias.” (People v. Ramos (2004) 34 Cal.4th 494, 519 [21 Cal.Rptr.3d 575, 101 P.3d 478].)
As the majority acknowledges, Jurors McClaren and Rennie committed “clear misconduct” (maj. opn., ante, at p. 892) that raised a presumption of prejudice. Even assuming the movie did not fall within the category of inherently prejudicial material, the present record fails to rebut the presumption of bias. Indeed, the record shows a substantial likelihood that these two *900 jurors were actually biased against defendant in that they relied on the extraneous material to his detriment.
The timeline of deliberations provides strong evidence of the movie’s influence on these two jurors. The jury began penalty phase deliberations on Tuesday, March 23, 1993,[2] at 2:51 p.m. and adjourned nine minutes later at 3:00 p.m. The jury deliberated all day on Wednesday. They resumed deliberations on Thursday at 9:40 a.m. and returned with a death verdict at 10:10 a.m., 30 minutes later.
After a full day of deliberations, McClaren and Rennie remained undecided. That evening, both jurors independently obtained the movie and watched at least part of it. The next day, with little or no discussion of the film, the jury rendered a death verdict within 30 minutes. Given the brevity of deliberations on Thursday, the most reasonable inference is that the movie influenced McClaren and Rennie to vote for death. Indeed, McClaren testified that she was not a “holdout” juror but “simply needed more information” before rendering a verdict. The only “information” she obtained between deliberations on Wednesday and Thursday was the movie. ■ “The foregoing evidence demonstrates that [their] misconduct was substantially related to important matters raised during trial.” (Nesler, supra, 16 Cal.4th at p. 585.)
Eight of the nine penalty phase jurors who testified at the evidentiary hearing confirmed that the jury discussed the movie during deliberations. Foreman Ary encouraged these “naive” jurors to watch the film because deliberations had gone on “too long.” Juror Britton confirmed this account. Juror Perez likewise remembered that two undecided jurors had been encouraged to watch the movie. McClaren herself admitted she was encouraged to watch the movie to see “what life would be like in prison.” Based upon the timeline of deliberations, there is little doubt that these events occurred on the only full day of deliberations, Wednesday, March 24. The majority does not suggest otherwise. McClaren testified that she voted for death after seeing the movie. Britton and Perez confirmed that the vote had been 10 to two in favor of the death penalty before McClaren and Rennie saw the film and the vote was unanimous for death thereafter. Ary testified the two jurors voted for death “right after they saw the movie.” Rennie testified there was no further discussion of the movie after she had viewed it.
It should be remembered that American Me was hardly an evenhanded documentary about prison fife. Its central theme was that prison is a breeding ground for criminal activity. The pro-death jurors here urged watching the film precisely because it made their point, that convicts can continue to kill and *901 commit other crimes while incarcerated. If McClaren and Rennie accepted the film as accurate, their viewing could only have been detrimental to the defense case.
The majority suggests that the timeline did not “establish a causal relationship between the movie and the verdict.” (Maj. opn., ante, at p. 895.) Noting that Juror Lewis, who did not watch the movie, had also been undecided but eventually voted for death, the majority asserts that “[t]he evidence, therefore, simply illustrates the unremarkable fact that reflection on the facts of the case and the arguments of fellow jurors, together with the passage of time, will prompt a decision.” (Ibid.) That fact is unremarkable, but we cannot say that is what happened for McClaren and Rennie. The assertion also fails to take into account the relevant standard. McClaren and Rennie’s conduct raises a presumption of prejudice. “The rationale for the presumption is venerable. ‘A juror is not allowed to say: “I acknowledge to grave misconduct. I received evidence without the presence of the court, but those matters had no influence upon my mind when casting my vote in the jury-room.” The law, in its wisdom, does not allow a juror to purge himself in that way.’ [Citation.] When a person violates his oath as a juror, doubt is cast on that person’s ability to otherwise perform his duties. [Citation.] The presumption of prejudice is appropriate in those situations.” (People v. Cooper (1991) 53 Cal.3d 771, 835-836 [281 Cal.Rptr. 90, 809 P.2d 865].)
This court cannot do for a juror what she cannot do for herself: simply disavow the misconduct. In “reflecting] on the facts of the case and the arguments of fellow jurors” (maj. opn., ante, at p. 895), there is no dispute that McClaren and Rennie watched a movie about prison gangs. The primary theme of the film is that prison is a breeding ground for criminal activity. After remaining undecided for a full day of deliberations, these two jurors returned the following day and voted for death within 30 minutes. That Juror Lewis, a juror who did not commit misconduct, also voted for death after initial indecision is beside the point. Might McClaren and Rennie have rendered the same verdict had they not seen the movie? Did these jurors actually rely solely upon evidence admitted at trial? We can but speculate. Yet speculation cannot rebut the presumption of prejudice that their misconduct raised.
The majority also suggests that the movie might not have affected the two undecided jurors because it introduced “no new information about prison life not already possessed by the other jurors who had previously seen the film, information those jurors had already conveyed to McClaren and Rennie during deliberations.” (Maj. opn., ante, at p. 895.) Far from rebutting the presumption of prejudice, these facts support it. The accounts of Foreman Ary and Juror Britton confirm that, even though the film’s concepts were discussed at length, Jurors McClaren and Rennie remained unpersuaded. Mere *902 verbal descriptions of the movie and the prosecutor’s argument failed to persuade these jurors to vote for death. This explains why Ary, in order to break the deadlock, suggested the undecided jurors watch the movie, and why he emphasized it was based upon a true story. The film would graphically illustrate the point the pro-death jurors had failed to convey through mere words.
Moreover, the active nature of the jurors’ misconduct provides insight into the film’s potential influence on them. Jurors McClaren and Rennie each went to Blockbuster, rented the film, and watched it. That they devoted such time to acquiring this extraneous information reflects that they believed it was important to consider in deciding upon a penalty. The jury’s speedy verdict after the film was viewed bolsters the conclusion that the film likely influenced the outcome.
The majority reasons the movie could not have had much impact on Jurors McClaren and Rennie because they did not recall the movie in detail at the evidentiary hearing. With respect to McClaren, the majority states: “When asked about her recollection of American Me, she did not say that it opened her eyes about life in prison, that she had learned about prison gangs or the Black Guerilla Family or violence in prison, or that it showed how life prisoners could kill within the prison walls.” (Maj. opn., ante, at p. 894.) Of course, McClaren would have been barred from providing much of this testimony by Evidence Code section 1150, subdivision (a), which prevents jurors from testifying about what influenced them “to assent to or dissent from the verdict or concerning the mental processes by which it was determined.” Thus, McClaren and Rennie could not have testified about the effect the movie had upon them. Indeed, the magistrate below sustained several objections on this ground when other jurors tried to testify regarding the movie’s effects.
With respect to McClaren’s alleged failure of recall, the evidentiary hearing was held in 2010, 17 years after deliberations. That McClaren could not recall, at this great remove, all the film’s details proves little.[3] Indeed, *903 McClaren could not even give a general physical description of Foreman Ary, nor could she recall the duration of deliberations. The following facts are to the point. McClaren recalled she was urged to see the movie to learn more about “what life would be like in prison,” and she voted for death the day after watching it. At least two other jurors confirmed this timeline. With respect to Rennie, the majority makes much of the circumstance that she did not watch the entire movie, testifying at the evidentiary hearing that she thought the movie was “rather repetitious”[4] and she watched the movie because she wanted “to get an idea on what people had been talking about . . . being in prison.” Far from suggesting that the movie had little impact, Rennie said she stopped watching the movie because she “had seen enough.” She understood the point of the movie, and “what people had been talking about” when they argued that inmates can continue to commit violent crimes in prison. The fact that the next day, within half an hour, Rennie voted for death bolsters the conclusion that there was a substantial likelihood the movie removed any remaining reservations.
The majority also suggests the movie did not affect deliberations because there was no discussion of it after McClaren and Rennie watched it. Again, the majority fails to persuasively explain how this circumstance rebuts the presumption of prejudice. If McClaren and Rennie watched the movie and accepted its premise, there would be no need for extensive discussion with 10 other jurors who already agreed. Indeed, the record confirms there was little discussion about any topic on the day of the verdict given the 30-minute timeframe. Although the majority suggests that neither McClaren nor Rennie mentioned they had seen the movie once deliberations resumed (maj. opn., ante, at p. 895), this suggestion is at odds with Ary’s testimony that one or both of them mentioned the film. The magistrate sustained a hearsay objection to any further elaboration on the point. In any event, Ary was well aware that McClaren and Rennie had seen the movie, suggesting the topic was at least mentioned. The brevity of subsequent deliberations strongly suggests the movie played a part in the two jurors’ decisionmaking.
Finally, the majority relies upon the testimony of Jurors Lewis and Rennie suggesting the undecided jurors did not change their votes in unison. When asked whether the undecided jurors changed their minds “one by one, or all together,” Lewis replied, “One by one.” Rennie initially claimed that, after watching the movie, she did not vote for death “the next day” but she “eventually did.” She later conceded she did not remember whether more than a day had passed between her seeing the movie and voting for death. Their testimony hardly calls into question the film’s likely impact. The *904 question is not whether McClaren and Rennie changed their minds at the same time, but whether there was a substantial likelihood that they did so because they were improperly influenced.
In sum, Jurors McClaren and Rennie committed misconduct. At the urging of other jurors, they watched a movie about prison gangs, for the express purpose of acquiring information to use in reaching a penalty verdict. This misconduct raises a presumption of prejudice against defendant. The totality of the circumstances “evidences a state of mind that rendered [McClaren and Rennie] unable to perform [their] duty not to prejudge the case and to render a decision based solely upon the evidence presented to the jury.” (Nesler, supra, 16 Cal.4th at p. 589.) Far from rebutting the presumption, the record reveals a substantial likelihood that they were actually biased. Because this bias affected only the penalty phase, I would reverse the death verdict and remand for a new penalty phase trial.
Liu, J., concurred.

 Olmos Productions, Universal Pictures 1992.

 Subsequent date references will be to the year 1993.

 The majority suggests that McClaren and Rennie’s recall of the film was “no sharper” in their written declarations, executed in 1999 and 2000, respectively. (Maj. opn., ante, at p. 894, fn. 11.) However, McClaren simply declared that “[tjhe movie American Me was also mentioned during penalty deliberations” and did not purport to describe the movie. Rennie declared that she was “not initially in favor of voting for the death penalty.” Ary, whom she remembered as “the bus driver,” suggested that she watch American Me and that “it would be an education for [her] about what prisons were really like.” She further declared: “I rented the movie one night during the deliberations. American Me is about gangs in California prisons and it was based on a true story.” Far from suggesting a failure of recall, Rennie remembered the essential facts: She did not initially vote for death, she watched American Me at Ary’s urging to “educat[e]” herself “about what prisons were really like,” and the film was about *903 prison gangs and was based upon a true story. There was no reason in the context of this declaration to give a more detailed account of the film.

 Our own viewing confirms this description.